# IN THE SUPREME COURT OF IOWA

No. 15–1464

Filed May 25, 2017

**STATE OF IOWA,**

Appellee,

vs.

**BRADLEY STEVEN GRAHAM,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

Defendant seeks further review of a denial of a motion to correct an illegal sentence. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Timothy M. Hau and Kevin R. Cmelik, Assistant Attorneys General, John P. Sarcone, County Attorney, and Nan Horvat, Assistant County Attorney, for appellee.

**APPEL, Justice.**

In this case, Bradley Graham, a juvenile offender convicted of one count of sex abuse in the third degree, challenges his lifetime special sentence of parole and the lifetime requirement that he register as a sex offender as cruel and unusual punishment under the Eighth Amendment of the United States Constitution and under article I, section 17 of the Iowa Constitution. The district court held Graham's lifetime special sentence and lifetime registration requirement were not cruel and unusual punishment because a juvenile offender could petition the Iowa Department of Corrections for discharge from both the lifetime special sentence and the lifetime registration requirement.

Graham appealed on the grounds that the special sentence and registration requirements violated the Cruel and Unusual Punishment and Due Process Clauses of the United States and Iowa Constitutions. The court of appeals affirmed the district court. We granted further review. We now affirm the decision of the court of appeals and the judgment of the district court.

### I. Factual and Procedural Background.

**A. Guilty Plea to One Count of Sexual Abuse.** Graham was charged in 2010 with three counts of sexual abuse in the third degree in violation of Iowa Code sections 709.1 (defining sexual abuse), 709.4(1) (sexual abuse in the third degree by force or against the will), and 709.4(2)(*b*) (sexual abuse in the third degree and the other person is twelve or thirteen years old) (2009) for conduct occurring when Graham was seventeen years old. These charges related to sex acts that allegedly occurred involving Graham and T.C. when T.C. was thirteen years of age.

On November 15, 2010, Graham pled guilty to one count of third-degree sexual abuse as the result of a sex act with T.C. when Graham

was seventeen years of age and T.C. was thirteen years of age.  *See* Iowa Code § 709.4(2)(*b*).  Graham did not plead guilty on the basis of "by force or against the will" under Iowa Code section 709.4(1).  Graham was immediately sentenced to an indeterminate period not to exceed ten years.  Under Iowa Code section 903B.1, Graham was sentenced to a special sentence of lifetime supervision by the department of corrections.  Graham was also required to register for life on the sex offender registry when he was released under Iowa Code section 692A.16.

**B. Motion and Hearing on Illegal Sentence.**  On September 6, 2013, Graham filed a pro se motion to correct an illegal sentence.  In the handwritten explanation accompanying the motion, Graham argued, among other things, that the special sentence of lifetime parole and lifetime sex offender registration requirement were "inhumane" because he was a juvenile at the time of the offense.

A hearing was held on Graham's motion on September 4, 2014. The State did not contest whether Graham should receive a resentencing hearing.  The district court ordered a resentencing hearing based on the agreement of the parties.

Prior to the hearing on resentencing, Graham was discharged from incarceration and began serving his lifetime special sentence.  Pursuant to the lifetime special sentence, Graham was placed at a work-release program at the Fort Des Moines Community Corrections Center. According to an officer at the work-release program, Graham was participating in sex offender treatment and other support programs while at the facility.

The resentencing hearing was held on August 18, 2015.  Graham's appointed counsel did not modify Graham's original application. Graham's counsel also did not file a brief before the district court.

At the resentencing hearing, Graham's counsel argued that under Iowa Code section 901.5(14) (2015), the judge could suspend any part of a juvenile's sentence in whole or in part, including the special sentence of lifetime parole.  Graham's counsel asked the judge to suspend all but ten years of the special sentence of lifetime parole.  Graham's counsel argued the special sentence of lifetime parole was punitive, because if Graham violated the terms of parole, Graham would face additional prison time.  Graham's counsel specifically did not challenge a special sentence of parole of up to ten years.  Graham's counsel challenged the sentence only to the extent it imposed a lifetime of parole.

Graham's counsel also argued that "the 2,000-foot rule" established in Iowa Code section 692A.114 was punitive and the court had the authority to suspend part of the sentence under section 901.5(14).  Graham's counsel noted that if Graham violated the 2000-foot rule, new criminal charges may be filed under Iowa Code section 692A.111.  Graham's counsel asked the court to immediately suspend the 2000-foot rule as it applied to Graham.

In support of his motion for resentencing, Graham offered an August 17, 2015 email from his parole officer, James Michels.  According to Michels, Graham arrived at the Fort Des Moines Community Corrections Center on April 15, 2015.  He had obtained employment and was a hard worker.  He was attending a sex offender treatment group and was on time and participating in the group.  Since coming to the facility, Graham had been written up for two major violations, one involving being out of place and the other for possession or use of alcohol.  Michels concluded that Graham "has been honest when he made poor choices and accepted the consequences."  Michels expressed

the hope "that his special [sentence] can be modified due to his offense happening when he was 17 years old."

On the question of whether the special lifetime sentence of parole was cruel and unusual, the State argued Graham was not without hope. The State asserted Graham could request the department of corrections to release him from his special sentence of lifetime parole at any time. *See* Iowa Code § 906.15. Likewise, the State argued, Graham could apply to the department of corrections to be released from the sex offender registry requirement. *See id.* § 692A.128.

The State argued the district court could not reduce the lifetime special sentence to a special sentence of a term of years or suspend the sex offender registration requirement. According to the State, Graham's sole recourse was to request a modification of the special sentence or registration requirements through the appropriate administrative channels.

In addition to Michels's letter, the district court also had before it Graham's original presentence investigation and a progress report. The presentence investigation outlined a history of juvenile and adult infractions, mostly involving burglary and theft. As a juvenile, Graham resided for a period of time at the Eldora Training School, earning a high school diploma there. Graham reported he had been physically abused by his mother's boyfriend when he was around seven or eight years old. He was taken away from his mother at age eight and lived with his grandmother until she passed away. At that time, he began living with his mother again and started "getting into trouble." Graham reported contact and visits with his father, who was serving a twenty-five-year prison sentence in Anamosa State Prison.

The court progress report dated May 12, 2015, indicated that Graham had a risk assessment score for violence of "3 (moderate)" and a victimization score of "4 (moderate/high)." The progress report listed a number of infractions in prison. Because of scheduling and disciplinary reasons, he was unable to complete the sex offender treatment program prior to his release on parole. The progress report indicated that Graham met diagnostic criteria for substance dependence or abuse related to marijuana and alcohol. According to assessment tools utilized by the department of corrections, Graham was categorized in a group that had "a below average probability of success and an above average chance of violent criminal activity." The department of corrections' recommendations were "for compliance with [an] on-going mental health treatment plan and continued participation in an intensive sex offender treatment program."

After the State concluded its argument, the district court gave Graham an opportunity to make a statement, which he declined. The court found that Graham was eligible for parole on the day he began his special sentence. According to the court, the special sentence did not carry with it any mandatory minimum. The court emphasized that it did not believe it had the authority to "stop the special sentence at a certain point in time." The court read Iowa Code section 901.5(14) as authorizing it to enter a suspended sentence or suspend part of a mandatory sentence, but not to cut off Graham's special sentence.

The district court did not expressly address the issue of Graham's challenge to the 2000-foot rule. But it stated,

> And the Sex Offender Registry laws are going to apply to you. But they apply to anyone that commits a sex offense. And there's other case law to suggest that's not a violation of the cruel and unusual punishment clause of the Constitution

either. So I think that decision is compliant with the law that governs what I have to do.

After the hearing, the district court entered a written order. The court ruled the special sentence was not cruel and unusual. Citing *State v. Lyle*, 854 N.W.2d 378, 400 (Iowa 2014), the court noted the length of the sentence was not unconstitutional and the court did not have the authority to cut the length of the special sentence. The court did not specifically address in its written order the constitutionality of the 2000-foot rule of the sex offender registry. The court denied Graham's motion to correct an illegal sentence.

Graham appealed. We transferred the case to the court of appeals.

**C. Issues Raised on Appeal.** As an initial matter, the court of appeals held that a defendant does not have a right of appeal for a denial of a motion to correct an illegal sentence. The court therefore chose to treat Graham's appeal as a petition for writ of certiorari and granted the writ. The court declined to extend our juvenile cruel-and-unusual-punishment cases to lifetime special sentence or sex offender registration categorically with respect to juveniles. *See State v. Sweet*, 879 N.W.2d 811 (Iowa 2016); *Lyle*, 854 N.W.2d 378; *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013); *State v. Null*, 836 N.W.2d 41 (Iowa 2013). The court of appeals also held the special sentence and sex offender registration were not grossly disproportionate to the gravity of Graham's offense, especially given the availability of early discharge and modification. Finally, the court of appeals held that Graham's due process challenges to his sentence were not preserved because they were not raised before the district court.

Graham applied for further review. We granted Graham's application. On appeal, Graham claims (1) a mandatory special sentence

of lifetime parole is categorically cruel and unusual punishment and violates due process when imposed on a juvenile, (2) mandatory lifetime sex offender registration is categorically cruel and unusual punishment and violates due process when imposed upon a juvenile, and (3) a mandatory special sentence of lifetime parole and mandatory lifetime sex offender registration, as applied to Graham, amount to cruel and unusual punishment because the punishment is grossly disproportionate to the underlying offense.

## II. Standard of Review.

A defendant may challenge the legality of a sentence at any time. *State v. Bruegger*, 773 N.W.2d 862, 869 (Iowa 2009); *accord Lyle*, 854 N.W.2d at 382. While we ordinarily review challenges to illegal sentences for errors at law, we review allegedly unconstitutional sentences de novo. *Lyle*, 854 N.W.2d at 382; *Ragland*, 836 N.W.2d at 113. Statutes are presumed constitutional—to rebut this presumption, one must prove the statute unconstitutional beyond a reasonable doubt. *State v. Wade*, 757 N.W.2d 618, 622 (Iowa 2008); *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005). A statute is unconstitutional beyond a reasonable doubt if one refutes "every reasonable basis upon which the statute could be found to be constitutional." *Seering*, 701 N.W.2d at 661 (quoting *State v. Hernandez-Lopez*, 639 N.W.2d 226, 233 (Iowa 2002)).

## III. Challenge to a Special Sentence of Lifetime Parole for a Juvenile Offender.

**A. Introduction.** In this case, Graham seeks to build on our cruel and unusual punishment caselaw for juvenile offenders. In *Sweet*, we declared categorically that a juvenile offender cannot be sentenced to life without the possibility of parole. 879 N.W.2d at 839. In *Lyle*, we

held that mandatory minimum sentences cannot be imposed without an individualized hearing. 854 N.W.2d at 404.

**B. Relevant Constitutional and Statutory Provisions.**

1. *Constitutional provisions.* The Eighth Amendment to the United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Article I, section 17 of the Iowa Constitution provides, "Excessive bail shall not be required; excessive fines shall not be imposed, and cruel and unusual punishment shall not be inflicted." Iowa Const. art. I, § 17. Although state supreme courts are free to develop their own cruel and unusual punishment jurisprudence independent of federal law and some have done so, parties often decline to advance a different standard under state constitutions. Even so, we do not necessarily apply the federal standards in a fashion identical to the United States Supreme Court. *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011); *Bruegger*, 773 N.W.2d at 883; *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 5 (Iowa 2004).

2. *Relevant statutory provisions.* The relevant statutory provision with respect to Graham's challenge to his special sentence is Iowa Code section 903B.1. Under this Code provision, a person convicted of certain sex offenses, including the offense to which Graham pled guilty, is subject

> to a special sentence committing the person into the custody of the director of the Iowa department of corrections for the rest of the person's life, with eligibility for parole as provided in chapter 906. The board of parole shall determine whether the person should be released on parole or placed in a work release program.

*Id.* § 903B.1. This special sentence in essence provides for a lifetime supervision involving either parole or work release for the offender. Iowa

Code section 903B.1 further provides that the sentence commences upon completion of the sentence imposed under any criminal sentencing provisions for the underlying criminal offense. *Id.*

A person serving a special sentence is placed on the corrections continuum in chapter 901B. *Id.* The terms and conditions of the special sentence, including violations, are subject to the same set of procedures as other violations of parole and work release in ordinary sentencing. *Id.* A revocation of release for violation of the provision of the special sentence shall not be for a period greater than two years for the first revocation and five years for any subsequent revocation. *Id.*

A person serving a mandatory special sentence of lifetime parole, however, is eligible for early release. According to Iowa Code section 906.15, "If a person has been sentenced to a special sentence under section 903B.1 . . . , the person may be discharged early from the sentence in the same manner as any other person on parole." However, a person convicted of certain crimes including Iowa Code section 709.4 "shall not be discharged from parole until the person's term of parole equals the period of imprisonment specified in the person's sentence, less all time served in confinement." *Id.* § 906.15.

**C. Positions of the Parties.** Graham argues under the principles of *Lyle*, we should declare that a mandatory lifetime special sentence of parole is cruel and unusual as applied to juvenile offenders. *See* 854 N.W.2d at 390–96. Graham recognizes that previous Iowa cases rejected constitutional challenges to the lifetime special sentence of parole. *See Wade*, 757 N.W.2d at 624; *State v. Sallis*, 786 N.W.2d 508, 518 (Iowa Ct. App. 2009); *State v. Harkins*, 786 N.W.2d 498, 508 (Iowa Ct. App. 2009); *State v. Jorgensen*, 785 N.W.2d 708, 717 (Iowa Ct. App. 2009). Graham argues, however, that these cases did not involve juveniles and were

decided prior to the United States Supreme Court cases of *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005), *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010), and *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012), and our juvenile cases. Graham urges that we take a fresh look at the issues in light of evolving caselaw. Specifically, he draws our attention to *State v. Dull*, 351 P.3d 641 (Kan. 2015). In *Dull*, the Kansas Supreme Court held that mandatory lifetime supervision of juvenile sex offenders violated the Eighth Amendment. *Id.* at 660. The same problem that we identified with mandatory life without the possibility of parole for juvenile offenders in *Ragland, Null*, and *State v. Seats*, 865 N.W.2d 543 (Iowa 2015), Graham asserts, infects mandatory lifetime special sentences. According to Graham, under Iowa Code section 903B.1, the sentencing court has no discretion in imposing a less severe sentence after factoring in the individual characteristics of the juvenile offender.

In response to the State's argument that he failed to exhaust administrative remedies, Graham asserts he is not challenging a parole decision, but rather the automatic imposition of a criminal punishment. Additionally, Graham argues, the State waived the exhaustion issue by failing to raise the argument before the district court.

The State initially argues that Graham has failed to exhaust his administrative remedies with the board of parole. Under Iowa Code section 906.15, the State points out, a special sentence is governed by the same rules as parole. According to the State, the decisions regarding parole continuance, modification, and revocation are parole decisions and not sentencing decisions. The State argues that an administrative action is the exclusive means that Graham has in challenging parole decisions under the Iowa Administrative Procedures Act.

The State also argues that a lifetime special sentence is not cruel and unusual punishment. Under United States and Iowa juvenile offender caselaw, the problem with life without parole or mandatory minimum sentences is, the State asserts, the lack of opportunity for parole. "[P]arole eligibility," the State stresses, "cures the constitutional violation." In the case of special sentences, the special sentence itself is parole. Additionally, this special sentence may be discharged when the offender demonstrates that he can abide by society's laws without supervision. The "lifetime" special sentence is not necessarily for life.

**D. Overview of Application of Cruel and Unusual Punishment for Juvenile Offenders.** The Cruel and Unusual Punishment Clause "embraces a bedrock rule of law that punishment should fit the crime." *Bruegger*, 773 N.W.2d at 872; *see also Weems v. United States*, 217 U.S. 349, 367, 30 S. Ct. 544, 549 (1910) ("[I]t is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense."). The notion that punishment should fit the crime, however, is an abstract generality. The United States Supreme Court has struggled to develop a coherent framework to implement that generality.

Three recent United States Supreme Court cases have explored the application of the Cruel and Unusual Punishment Clause to juvenile offenders. In *Roper*, the Court held the Eighth Amendment categorically prohibited the imposition of the death penalty on defendants who were juveniles at the time of the offense. 543 U.S. at 578, 125 S. Ct. at 1200. The *Roper* Court analyzed "the evolving standards of decency that mark the progress of a maturing society" by seeking evidence of a national consensus and by bringing its own independent judgment to bear on the question. *Id.* at 561, 563, 125 S. Ct. at 1190, 1192 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 598 (1958) (plurality opinion)).

The Court also articulated the broad areas of fundamental difference between juvenile and adult defendants. *Id.* at 569–70, 125 S. Ct. at 1195–96. Juveniles lack maturity and often have "an underdeveloped sense of responsibility . . . [which] often result[s] in impetuous and ill-considered actions and decisions." *Id.* at 569, 125 S. Ct. at 1195 (quoting *Johnson v. Texas,* 509 U.S. 350, 367, 113 S. Ct. 2658, 2668–69 (1993)). "[J]uveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* Finally, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570, 125 S. Ct. at 1195.

These fundamental differences mean that juveniles lack the same moral responsibility as adults and are less likely to have an "irretrievably depraved character" due to the transitory nature of youth. *Id.* at 570, 125 S. Ct. at 1195–96. Because of this, some penological justifications apply with less force to juvenile defendants—retribution, because juveniles lack the same moral culpability, and deterrence, because juveniles often do not engage in a cost-benefit analysis that attaches any real weight to punishment. *Id.* at 571–72, 125 S. Ct. at 1196. In a later case, the Court also explained that the goal of incapacitation applies with less force toward juveniles, because very few juveniles are truly incorrigible and it is exceedingly difficult to determine which rare juvenile is so. *Graham,* 560 U.S. at 72–73, 130 S. Ct. at 2029 (holding juvenile offenders who did not commit homicide may not be sentenced to life without the possibility of parole); *see also Miller,* 567 U.S. at \_\_\_, 132 S. Ct. at 2475 (holding mandatory juvenile life without possibility of parole cruel and unusual); *cf. Sweet,* 879 N.W.2d at 830–32 (summarizing the United States Supreme Court caselaw).

Our cases have extended the reasoning of *Roper*, *Graham*, and *Miller* under the Iowa Constitution, article I, section 17. *See, e.g.*, *Sweet*, 879 N.W.2d at 839; *Seats*, 865 N.W.2d at 558; *Lyle*, 854 N.W.2d at 404; *Ragland*, 836 N.W.2d at 122; *State v. Pearson*, 836 N.W.2d 88, 97 (Iowa 2013); *Null*, 836 N.W.2d at 76; *Bruegger*, 773 N.W.2d at 886. As we explained in *Sweet*, our cases have embraced the general principles of the *Roper–Graham–Miller* trilogy and have applied them to de facto life sentences, very long sentences, and relatively short sentences. 879 N.W.2d at 834.

In *Lyle*, we held that mandatory minimum prison sentences which deprived courts of the discretion to consider the youth of the offender as a mitigating factor were cruel and unusual punishment under the Iowa Constitution, no matter the length of the mandatory minimum. 854 N.W.2d at 404. *Lyle* did not declare that minimum prison sentences per se were unconstitutional, but only that the mandatory imposition of minimum adult prison sentences on juvenile offenders violated the cruel and unusual punishment clause of article I, section 17 of the Iowa Constitution. *Id.* According to *Lyle*, some juveniles might deserve the same minimum prison sentence as an adult, but others, because of their youth, may be less culpable. *Id.* at 403. But, as stated in *Null*, the *Miller*-factors must be considered at an individualized sentencing hearing before a judge may sentence a juvenile to a minimum adult prison term. *Null*, 836 N.W.2d at 75. As noted in *Null*, however, there is no guarantee of release, only a " 'meaningful opportunity' to demonstrate rehabilitation and fitness to return to society." *Id.* (quoting *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030).

**E. Empirical Studies Related to Recidivism Rates of Juvenile Offenders.** There have now been several decades of empirical research

on the recidivism rates of juvenile sex offenders. The literature suggests most juvenile offenders who commit sex offenses will outgrow their behavior and that juveniles adjudicated delinquent for sex offenses have extremely low rates of recidivism generally and even lower rates of sexual reoffending. *See* Amy E. Halbrook, *Juvenile Pariahs*, 65 Hastings L.J. 1, 14–15 (2013) [hereinafter Halbrook].

In 2006 and 2007, Franklin Zimring and his associates conducted two studies designed to examine the risk of recidivism among people adjudicated delinquent for sex offenses. *See* Franklin E. Zimring et al., *Investigating the Continuity of Sex Offending: Evidence from the Second Philadelphia Birth Cohort*, 26 Just. Q. 58 (2009) [hereinafter Zimring, *Philadelphia*]; Franklin E. Zimring et al., *Sexual Delinquency in Racine: Does Early Sex Offending Predict Later Sex Offending in Youth and Young Adulthood?*, 6 Criminology & Pub. Pol'y 507 (2007) [hereinafter Zimring, *Racine*]. The studies showed juvenile sex offenders pose little risk of recidivism, especially in adulthood. Zimring, *Philadelphia*, 26 Just. Q. at 65–67; Zimring, *Racine*, 6 Criminology & Pub. Pol'y at 526–28; *see also* Halbrook, 65 Hastings L.J. at 13–14. Similarly, a study by Michael Caldwell of 265 juveniles released from a secure facility found that during a period of about six years, the prevalence of new sex offenses for those previously adjudicated for sex offenses was 12.1% compared to 11.6% for those previously adjudicated for non-sex offenses. Michael F. Caldwell et al., *An Examination of the Sex-Offender Registration and Notification Act as Applied to Juveniles: Evaluating the Ability to Predict Sexual Recidivism*, 14 Psychol., Pub. Pol'y, & L. 89, 96–97, 101 (2008). Finally, studies by Elizabeth Letourneau and her associates in 2008 and 2009 showed that juvenile sex offender reconviction rate for sexual offenses was less than one percent. Elizabeth J. Letourneau & Kevin S.

Armstrong, *Recidivism Rates for Registered and Nonregistered Juvenile Sex Offenders*, 20 Sexual Abuse: J. Res. & Treatment 393, 400 (2008); *see* Halbrook, 65 Hastings L.J. at 15 n.96.

**F. Iowa Caselaw on Special Sentences of Lifetime Parole for Adults.** We have not had occasion to consider the application of cruel and unusual punishment principles to the imposition of lifetime parole sentences on juvenile offenders. We have, however, considered the question in connection with adult offenders.

In *State v. Lathrop*, we considered whether a special sentence of lifetime parole could be applied retroactively to crimes which occurred shortly before Iowa Code section 903B.1 went into effect. 781 N.W.2d 288, 291 (Iowa 2010). In concluding that application of the newly passed special sentence of lifetime parole was a violation of the ex post facto clause, *Lathrop* held that a special sentence of lifetime parole was a punishment. *Id.* at 297. According to *Lathrop*, the special sentence of lifetime parole was punishment because the special sentence would begin after an offender's release from incarceration, would impose affirmative restraints and disabilities similar to or greater than traditional parole, and was imposed without any finding that the offender posed a risk to the safety of others at the time of release from incarceration. *Id.* at 296.

In *State v. Wade*, we considered whether an adult offender's challenge to a ten-year special sentence of parole for indecent exposure, a serious misdemeanor, amounted to cruel and unusual punishment. 757 N.W.2d 618, 622 (Iowa 2008). Wade argued that the ten-year special sentence, with the possibility of imprisonment for two or five-year terms for violations, was grossly disproportionate to the maximum sentence for serious misdemeanors. *Id.* at 623. In *Wade*, we cited *Seering*, 701

N.W.2d 670, where the court held that a two-year sentence for violating the sex offender registration law was not cruel and unusual. *Id.* at 624. The *Wade* court then summarily concluded the special sentence was not grossly disproportionate to the crime of indecent exposure because any additional imprisonment would only result if Wade violated the terms of the special sentence. *Id.*

In *State v. Tripp*, an adult offender challenged a lifetime special sentence of parole as cruel and unusual as applied to a conviction for sexual assault in the third degree. 776 N.W.2d 855, 857 (Iowa 2010). At the time of the case, Tripp was serving five years of probation, so had not yet begun his special sentence. *Id.* at 858. We held the issue was not ripe for our review. *Id.* at 859. The *Tripp* court stated, "We do not know the terms of his parole and the extent to which those terms may be onerous. Although standard parole terms exist, any or even all of those terms may be deleted." *Id.* at 858. We further said,

> It is also significant that the special sentence is not necessarily for life. Section 903B.1 provides for the possibility of release from parole under chapter 906 if the parole board determines that the offender is "able and willing to fulfill the obligations of a law abiding citizen without further supervision."

*Id.* (quoting Iowa Code § 906.15). We emphasized that we could not know whether or not Tripp might be released from parole at any time. *Id.*

**G. Caselaw from Other State Jurisdictions.** The Supreme Court of Kansas recently considered whether a lifetime special sentence of parole was cruel and unusual. *See Dull*, 351 P.3d 641. In *Dull*, the defendant brought an Eighth Amendment challenge to a special sentence imposing lifetime postrelease supervision on an offender who was convicted of "aggravated indecent liberties with a child," a felony, and who was a juvenile at the time of the offense. *Id.* at 647–48. The *Dull*

court canvassed the *Roper–Graham–Miller* United States Supreme Court caselaw, before applying the two-prong *Graham* analysis for categorical challenges under the Eighth Amendment. *Id.* at 650.

After a lengthy analysis, including a comprehensive review of state law on lifetime supervision, the *Dull* court concluded that Dull had failed to show a national consensus against lifetime postrelease supervision for juvenile offenders. *Id.* at 660. Yet, after applying its own judgment, the Kansas court concluded that mandatory lifetime supervision for juvenile offenders was cruel and unusual because (1) juveniles have diminished moral culpability because of all the characteristics of juveniles described in *Miller* and (2) mandatory lifetime supervision is a severe sentence in and of itself because the supervision restricts the juvenile's liberty and severely restricts the juvenile's life. *Id.*

The Supreme Court of Nebraska, however, came to a contrary result in *State v. Boche*, 885 N.W.2d 523 (Neb. 2016). Under Nebraska law, certain sex offenders are subject to lifetime community supervision, but unlike the Kansas provision, the level of supervision for each offender is tailored to the individual after a risk assessment, with a requirement that the restrictions imposed be the least restrictive available based on the risk of recidivism and public safety. *Id.* at 532–33. The offender has a right to appeal the conditions and argue that less restrictive conditions are available and should be imposed. *Id.* at 533. Additionally, the restrictions imposed were reviewed on a yearly basis and would be modified as warranted. *Id.* at 538.

After a lengthy analysis, the *Boche* court held that the lifetime postrelease supervision was not cruel and unusual under the Eighth Amendment. *Id.* at 538–39. Of particular importance to the Nebraska court was the individualized nature of the restrictions imposed on

offenders by the lifetime community supervision. *Id.* at 537–38. Additionally, the fact that restrictions may be appealed and revised as needed throughout the offender's life rendered the sentencing scheme flexible enough to pass *Miller* muster. *Id.* at 538.

The *Boche* court also explained,

> We recognize that the Kansas Supreme Court recently held that mandatory lifetime postrelease supervision is cruel and unusual punishment when applied to a juvenile sex offender. In doing so, that court explicitly found the provisions of Kansas' supervision were "more severe than most other jurisdictions" and recognized that the provisions resulted in a "sentence that restricts the juvenile's liberty for life without any chance, hope, or legal mechanism of having those restrictions lifted or even reduced."

*Id.* (footnotes omitted). Finding the Nebraska statute's community supervision requirements "differ significantly and materially" from the Kansas statute, the *Boche* court did not find the Kansas court's opinion helpful. *Id.*

**H. Analysis of Cruel and Unusual Punishment in This Case.** We note at the outset that under the statute, Graham is eligible for release from his special mandatory lifetime sentence of parole. The statute is like that in *Boche*, 885 N.W.2d 523, where the Nebraska Supreme Court found the statute did not violate cruel and unusual punishment.

Graham claims there is reason to suspect the parole board may be reluctant to discharge an offender from the special sentence, no matter the original characteristics of the juvenile offender or the offender's demonstration of rehabilitation. But Graham has offered little to no evidence to support this possibility. On appeal, Graham's brief cites a report to the general assembly from the Iowa Sex Offender Research Council from January 2014, which provides general data about the

number of adult and juvenile offenders receiving a special sentence, but there is no data about requests for discharge.

We faced a similar situation in *State v. Louisell,* 865 N.W.2d 590 (Iowa 2015). In *Louisell,* the appellant challenged her sentence of life without parole for her first-degree murder conviction, which she committed as a juvenile. *Id.* at 594. In the district court, she presented evidence that she completed numerous educational courses and programs while in prison, including obtaining an associate's degree and a bachelor's degree; that she learned the trade of electrician's helper; that she was in numerous musical and religious activities in the prison; and that she was a published author who mentored and tutored other incarcerated women. *Id.* at 594–95. She presented letters of support from the prosecuting attorney and judge that presided over her criminal trial. *Id.* at 595. She also presented evidence she had a job if she was released and a support system to help her reenter society upon her discharge. *Id.*

The district court—after acknowledging it might not have the statutory authority—held that Louisell's sentence of life without parole was illegal without a *Miller*-type hearing. *Id.* The district court concluded after a *Miller*-type hearing that Louisell was entitled to the possibility of parole. *Id.* The district further held, however, on the record presented, that Louisell's term in prison should be reduced to a term of twenty-five years and that Louisell was entitled to release. *Id.*

In *Louisell,* the state conceded that Louisell's original sentence without a *Miller*-type hearing was invalid, but the State challenged the district court's ruling reducing Louisell's prison term to twenty-five years and ordering her release. *Id.* at 596. The gist of the state's position was

that the parole board, and not the court, should make the determination as to whether Louisell was entitled to release. *Id.*

On the record in *Louisell*, we sided with the state. *Id.* at 601. We did not question that Louisell made a compelling showing regarding her rehabilitation. *Id.* at 595. Nonetheless, we held there was no statutory authority for the district to reduce her sentence to twenty-five years. *Id.* at 597–98.

We next considered the district court's alternate determination that Louisell should be released on parole. *Id.* at 601. Louisell recognized that ordinarily the parole board makes the determination, but argued that her eligibility for parole was illusory, not real. *Id.* at 601–02. She presented a newspaper article that suggested that since *Miller*, *Ragland*, *Null*, and *Pearson* were decided, only one of thirty-eight juvenile offenders originally sentenced to life without the possibility of parole had been granted parole. *Id.* at 601.

We held, however, that her claim was not ripe. *Id.* at 602. Because her life without the possibility of parole had just been vacated, the parole board had not yet had an opportunity to consider whether she should be released. *Id.* We stressed, however, that the meaningful opportunity for parole must be realistic. *Id.* We left for another day whether repeated cursory denials of parole of offenders who had shown rehabilitation or maturity would evince that a meaningful or realistic opportunity for release as required under our caselaw is illusory. *Id.*

We think *Louisell* is instructive in this case. With respect to the possibility of release from parole, the statute here vests the parole board with authority to make those decisions in the first instance.

We do note that under Iowa Code section 906.15, there is a mandatory minimum period of parole. Specifically, the statute requires

that Graham's parole extends at least as far as the maximum of his underlying sentence or, in this case, ten years. We note, however, that Graham twice specifically declined to attack a ten-year period of probation. Instead, he focused his fire solely on the imposition of *lifetime* parole. For that reason, we are not called upon to address the narrower question of whether a minimum period of parole may be imposed on juvenile offenders.

In our decision today, however, we do not consider the constitutionality of a de facto refusal of the parole board to ever consider release of lifetime parole for juvenile sex offenders. We have no occasion to consider whether a blanket refusal to consider release from parole of a class of juvenile offenders without a risk assessment that takes into account the vicissitudes of youth and the opportunity to show rehabilitation and maturity. If the parole board were to adopt such an approach, then a question similar to that posed in *Dull* might be presented. 351 P.3d at 660. We have no occasion to confront such an issue today.

**I. Conclusion.** For the above reasons, and on the record developed below, we conclude that Graham is not entitled to relief from his sentence as cruel and unusual based on the limited claim related to mandatory lifetime parole presented to the district court in this case.

**IV. Challenge to Lifetime Sex Offender Registration as Cruel or Unusual.**

On appeal, Graham challenges his sentence of lifetime sex offender registration under Iowa Code chapter 692A. The issue of the application of lifetime sex offender registration to juvenile offenders has received attention from commentators and in the courts. *See, e.g.,* Catherine L. Carpenter, *Throwaway Children: The Tragic Consequences of a False*

*Narrative*, 45 Sw. L. Rev. 461, 489–94 (2016); Heather Ellis Cucolo & Michael L. Perlin, *"They're Planting Stories in the Press": The Impact of Media Distortions on Sex Offender Law and Policy*, 3 U. Denv. Crim. L. Rev. 185, 205–06 (2013); Phoebe Geer, *Justice Served? The High Cost of Juvenile Sex Offender Registration*, 27 Dev. Mental Health L. 34, 38–50 (2008); Alex Duncan, Note, *Calling a Spade a Spade: Understanding Sex Offender Registration as Punishment and Implications Post-*Starkey, 67 Okla. L. Rev. 323, 346–49 (2015).

In support of his argument, Graham cites *In re C.P.*, 967 N.E.2d 729 (Ohio 2012). In *In re C.P.*, the Ohio Supreme Court held lifetime sex offender registration was unconstitutional as applied to juveniles under the United States and Ohio Constitutions on cruel and unusual punishment and due process grounds. *Id.* at 750. The Ohio Supreme Court noted although states were required to conform with the provisions of the Federal Sex Offender Registration and Notification Act (SORNA) or risk loss of federal funds, many states engaged in foot-dragging, particularly because of the inclusion of juveniles on registries. *Id.* at 738–39. The Ohio Supreme Court found a shift against the policy that Ohio imposed to conform with SORNA. *Id.* at 739. Further, exercising independent judgment, the Ohio Supreme Court considered the culpability of juvenile offenders, the nature of the offenses, the severity of punishment, and the application of the *Graham* factors. *Id.* at 740–46.

In contrast to *In re C.P.*, the Supreme Court of Nebraska came to a contrary conclusion in *Boche*, 885 N.W.2d 523. The Nebraska Supreme Court noted that under its precedents, lifetime registration was not punitive in nature. *Id.* at 531. It declined to revisit its past precedent on the lifetime registration issue. *Id.* at 531–32.

In the past, however, we have held, at least as applied to adults, lifetime sex offender registration was not punitive under statutes then in existence. *Seering*, 701 N.W.2d at 669; *State v. Pickens*, 558 N.W.2d 396, 400 (Iowa 1997). We have also held that an offender failed to show that the 2000-foot rule was effectively banishment as applied to him, and therefore punitive. *Formaro v. Polk County*, 773 N.W.2d 834, 844 (Iowa 2009). And, while a federal district court in Iowa concluded that lifetime sex offender registration under Iowa Code chapter 692A was punitive after the development of a thorough record in *Doe v. Miller*, 298 F. Supp. 2d 844, 871 (S.D. Iowa 2004), a divided United States Court of Appeals for the Eighth Circuit reversed. *Doe v. Miller*, 405 F.3d 700, 723 (8th Cir. 2005).

In the district court, however, his counsel only attacked one aspect of Iowa Code chapter 692A, namely, the application of the 2000-foot rule. For instance, no claim was made that the lifetime registration requirement was cruel and unusual because of its stigmatization of juvenile offenders, and no claim was made that the requirement that registrants personally appear periodically before the sheriff every three months under threat of criminal prosecution was disproportionate. The sole issue presented at the hearing was the viability of the 2000-foot rule.

At the outset, we note that no record was developed before the district court on the impact of the 2000-foot rule on Graham. The case is thus strikingly different than *Doe*, where plaintiffs presented the federal district court with an elaborate record including testimony from experts on supervision of sex offenders, maps showing the impact of the 2000-foot rule on available housing, and detailed testimony and affidavits from sixteen offenders. 298 F. Supp. 2d at 849–65. Here, no such presentation was made. As we noted in *State v. Groves*, when a

party chooses not to present evidence regarding the impact the statute has on the party, we are unable to determine whether a residential statute precludes the party from residing in a fashion that violates constitutional norms. 742 N.W.2d 90, 93 (Iowa 2007).

Further, on the question of application of the 2000-foot rule to juvenile offenders, Graham has not shown any injury in fact. At the time of the hearing, he was a resident at the Fort Des Moines Community Corrections Center. He did not choose his residency. It was chosen for him. His choice of residency had nothing to do with the 2000-foot rule, and he has not demonstrated any harm arising from it. As a result, Graham has not demonstrated any injury in fact to entitle him to relief. *See Godfrey v. State*, 752 N.W.2d 413, 419 (Iowa 2008); *Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 868 (Iowa 2005).

**V. *Bruegger*-Type Cruel and Unusual Punishment Challenge.**

In addition to his categorical challenge, Graham argues the mandatory lifetime special sentence of lifetime parole and the mandatory lifetime registration are unconstitutional as applied to him under *Bruegger*, 773 N.W.2d 862. In *Bruegger*, we held that an offender may claim that a criminal sentence, though not necessarily facially invalid, could be grossly disproportionate as applied to the specific offender and thus violate the Cruel and Unusual Punishment Clauses of the United States and Iowa. *Id.* at 873.

Because Graham lacks injury in fact with respect to the validity of the 2000-foot residential restriction, we do not consider his as-applied attack on it. But Graham has preserved and presented us with his *Bruegger*-type challenge to his lifetime special sentence of parole. In considering his challenge to his lifetime of parole, we must consider his

current status—namely that he is subject to parole but may be relieved of parole obligations sometime in the future by the parole board.

At this time, based on the record before us, we cannot speculate regarding what action the parole board may take in the future. *See Tripp*, 776 N.W.2d at 858–59. What is before us is the narrow question of whether the current parole restrictions amount to cruel and unusual punishment as applied to Graham.

On the specific issue before us, Graham's *Bruegger*-type argument fails. Graham did not offer into evidence a copy of his parole conditions, so we are hampered in our review. We have no way of assessing whether particular parole conditions are problematic, but can only assess the general framework of supervision provided when an offender is on parole.

We can look at the few records that were before the district court. The presentence investigation report on Graham showed an extensive juvenile offense history involving thefts and burglaries prior to his sexual offense. He participated in anger management programming while in juvenile placement. He was suspended and expelled from Newton High School. He later received a high school diploma while in placement at the Iowa Training School for Boys at Eldora.

The department of correction's progress report that is part of the record in this case indicates that Graham is assessed as having a "moderate" risk of violence and a "moderate/high" risk of victimization. According to the progress report, Graham meets the DSM-IV diagnosis for substance dependence. His Jesness Inventory placed Graham in a category of persons who "have a below average probability of success and an above average chance of violent criminal activity." The department of corrections recommendations were for ongoing mental health treatment

and continued participation in an intensive sex offender treatment program. Graham has not attacked any of these findings.

The record contains an email from Graham's current parole officer. The email indicates that while at the Fort Des Moines facility, Graham has been employed and continues to attend a sex offender treatment group daily. Graham's parole officer indicates that Graham has had two major written reports at the Fort Des Moines facility, one for being out of place of assignment and the other for possession or use of alcohol. The parole officer concludes by noting, "I am hopeful that his special [sentence] can be modified due to his offense happening when he was 17 years old."

Graham was discharged from prison in April 2015. At the time of the district court hearing in this case, he had been on parole for a year and a half. Given the factual record presented at the hearing, we see no basis to interfere with his current parole status based on a claim that his parole status violates the Cruel and Unusual Punishment Clauses of the United States or Iowa Constitutions. Graham simply does not present the kind of grossly disproportionate punishment based on his current parole status to support a cruel and unusual punishment claim with respect to his parole.

## VI. Due Process Challenge.

Graham on appeal challenges his sentence on due process grounds. The due process issue, however, was not raised in the district court. We decline to address it on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002); *Metz v. Amoco Oil Co.*, 581 N.W.2d 597, 600 (Iowa 1998).

**VII. Conclusion.**

For the above reasons, we conclude the decision of the court of appeals and the judgment of the district court should be affirmed.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**