# IN THE SUPREME COURT OF IOWA

No. 19–1285

Submitted January 20, 2021—Filed June 25, 2021
Amended September 8, 2021

**KENNETH DOSS,**

Appellant,

vs.

**STATE OF IOWA,**

Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Warren County, Richard B. Clogg, Judge.

Applicant for postconviction relief seeks further review of the court of appeals' affirmance of the denial of his application for postconviction relief. **DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman and McDermott, JJ., joined in full and McDonald and Oxley, JJ., joined in part. Appel, J., filed a special concurrence. McDonald, J. filed a special concurrence, in which Oxley, J., joined.

Raya D. Dimitrova (argued) of Carr Law Firm, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Thomas E. Bakke (argued), Assistant Attorney General, for appellee.

Matthew T. Lindholm, West Des Moines, and Mary K. Spellman, West Des Moines, for amicus curie Iowa Association for Justice.

Rita Bettis Austin of ACLU of Iowa, Des Moines, for amicus curie American Civil Liberties Union of Iowa.

Thomas J. Miller, Attorney General, and John R. Lundquist, Assistant Attorney General, for amicus curie Iowa Board of Parole.

**MANSFIELD, Justice.**

This case involves a convicted sex offender's challenge to two aspects of his lifetime special parole sentence. First, the offender maintains that the terms and conditions of that parole should have been disclosed to him back in 2007, when he pled guilty. Second, the offender maintains that certain sex-offender-treatment-program (SOTP) parole restrictions as to internet use, dating, contact with minors, church attendance, and independent counseling violate his constitutional rights to free speech and freedom of association. The district court rejected both challenges, and so did the court of appeals.

On further review, we also reject these challenges. We conclude that the terms of a parole agreement are collateral consequences that need not—and, as a practical matter, probably could not—be disclosed at the time of the initial guilty plea. Additionally, we conclude that the offender has not shown the SOTP restrictions were unconstitutional as applied to *him*, i.e., that they resulted in an unlawful parole revocation. *See* Iowa Code § 822.2(1)(*e*) (2017). Accordingly, we affirm the judgment of the district court and the decision of the court of appeals.

## I. Background Facts and Proceedings.

In 2007, Doss was charged by amended trial information with one count each of sexual abuse in the third degree, a class "C" felony; lascivious acts with a child, a class "C" felony; and indecent contact with a child, an aggravated misdemeanor. Pursuant to a plea agreement, on February 15, 2007, Doss pled guilty to one of the class "C" felonies— lascivious acts with a child. *See* Iowa Code § 709.8 (2005). As part of the agreement, the State dismissed a misdemeanor assault charge in another case and allowed Doss to argue for a suspended sentence. The State

reserved the right to argue for the sentence recommended in the presentence investigation report.

In pleading guilty, Doss admitted to the district court that he did the following to a child on or about September 6, 2005:

> I spent the night at my cousin's house. I got up in the middle of the night and went into my second cousin's bedroom, got underneath the covers, and I touched her pubes and I realized—I was in there about five minutes, realized what I was doing was wrong, and went downstairs.

As part of the district court's plea colloquy, the district court asked Doss if he understood he would be "on probation for life" due to the nature of his offense. Doss confirmed he understood this.

On April 11, 2007, Doss's sentencing took place. The district court sentenced Doss to an indeterminate term of incarceration not to exceed ten years but suspended the sentence and placed Doss on probation, imposed a fine, and imposed the special sentence of lifetime parole under Iowa Code section 903B.1 to begin at the completion of Doss's probation. Doss was also ordered to undergo SOTP, and a no-contact order was put in place between Doss and the victim.

Approximately three months later, on July 23, Doss was found in contempt for having violated the terms of his probation and was sentenced to seven days in jail and ordered to undergo a psychological evaluation. Some five months after that, based on a further violation, the district court revoked Doss's probation and sent him to prison.

Doss was paroled in 2015 after having served about seven years and nine months in prison. He had been required to but did not complete SOTP while in prison. On August 14, 2015, Doss signed a parole agreement. Therein, Doss agreed to obey all laws, not to use drugs or alcohol, to obey any curfew restrictions, not to leave the county without

permission, to complete SOTP, not to associate with persons with a criminal record, not to have to contact with minors, and not to "use the internet or other forms of electronic social media for anything other than job searches" unless he received approval.

In March 2016, Doss went through a parole revocation hearing, but his parole was continued. In June, he again had a revocation hearing. This time he was "revoked to work release" with a two-year sentence imposed. *See* Iowa Code § 903B.1 (two-year sentence for first revocation).

On October 28, Doss was discharged on parole from the work-release facility where he had been staying. He signed another parole agreement. Once again, the agreement provided that Doss would obey all laws, not use drugs or alcohol, obey any curfew restrictions, complete SOTP, and not associate with persons with a criminal record. The restriction on contact with minors was reworded; it merely prohibited contact with minors "unless approved." And there was no restriction on internet use in the 2016 parole agreement itself.

Three days later, on October 31, Doss was presented with and signed an SOTP rules and conditions contract. Doss agreed he would "attend SOTP group sessions as scheduled"; "not participate in any form of outside counseling"; "not attend church or religious gatherings"; "not establish, pursue or maintain any dating, romantic and/or sexual relationship(s)"; "not purchase, possess or view sexually explicit materials"; "not view, access or use the Internet"; "not view or possess images/photos/videos of my victim(s) or minors"; and "not have direct or indirect contact with any minors." Doss agreed to abide by these conditions "unless [he] obtain[ed] documented approval for any changes, additions, or amendments by [his parole officer], Board of Parole (when required) and SOTP team."

Within a month, Doss was facing another parole revocation for violations that had occurred in November. Doss's parole violations included missing SOTP group therapy, viewing pornographic and dating/hookup websites, being around individuals with criminal records without approval, dating, allowing a female to stay in his home, and possessing a photograph of himself holding a minor that was taken while he was not approved to have contact with minors. Doss admitted to being in a sexual relationship with a woman with a criminal record; the two of them were staying at a hotel. Doss also appeared to be trying to start a relationship with a younger individual through a "risqué dating site."

Following the revocation of his parole, Doss returned to prison. *See* Iowa Code § 903B.1 (five-year sentence for second revocation). From the Newton Correction Facility, Doss filed the present postconviction relief application on March 21, 2017. In the application, Doss claimed his plea counsel was ineffective in failing to "adequately inform [him] of the extent of the rules and requirements of the special sentence at the time of his plea." Doss also challenged certain requirements of his special sentence as violating the First Amendment and article I, section 7 of the Iowa Constitution.

On May 24, 2019, the district court held a bench trial on Doss's application. Joseph Swaim, Doss's parole officer during 2016, testified about Doss's special sentence, his parole agreement, and his SOTP agreement. He explained the SOTP rules go in place for everyone, such as Doss, who is required to undergo SOTP treatment on leaving prison. He characterized the rules as "negotiable," as they are "[t]ypically . . . intact for a time period until evaluations and assessments and decisions have been made by the psychologist for further programming or not further programming and some type of staffing can be done regarding the

individual." Swaim agreed that for any violation of an SOTP rule, a parolee potentially could—but not necessarily would—be sent back to prison. He confirmed that the SOTP agreement allows for the written rules to be amended:

> Q. Fair to say that having a girlfriend is not against the law unless you're on this treatment plan? A. It's still not against the law in the treatment plan. It still can be amended if you read the statement of understanding on the back page of Exhibit 2. It says, "I confirm that I understand all rules and conditions outlined in this document. I agree to abide by all conditions as stated throughout the duration of my supervision unless I obtain documented approval for any changes, additions or amendments by my PO, Board of Parole and SOTP team." So it's not a hard and fast [rule]. These are the rules for the duration. They have the ability to get those amended and changed.

Swaim noted Doss's treatment plan could be amended. However, Doss never obtained permission to amend his plan, nor was there evidence that he ever sought to amend it.

Swaim further explained that the purpose of SOTP is first to evaluate and then to rehabilitate the sex offender:

> Q. So there was no individualized determination as to each particular rule as it applies to any particular individual. It's just everybody? A. There is because that's what the evaluation period is for. When we spend time evaluating them and having them meet with psychologists, that is to determine what rules are appropriate for this individual. That cannot be done initially because we don't have an understanding of who the person is even if they've been in our program before. Things change over time periods. So, yes, we do have that evaluation period before we come up with amendments and changes to a more specified, specific plan for that individual.

Doss's plea counsel from 2007 also testified. He had no independent recollection of Doss or of representing him. He could not remember his standard practice for advising people regarding the special sentence, although he doubted he would have provided any advice on the rules that would be in effect during the special sentence.

Doss himself was the third and final witness. He testified that his plea counsel told him the rules of the special sentence were "used as a monitoring thing" and "[a]s long as I followed the actual law, I would be okay." Doss stated he never had any conversations with plea counsel about specific rules provisions, so he was unaware that he would have to abide by rules that went beyond existing laws. He testified he would not have pled guilty had he known of certain rules, such as being unable to have a girlfriend or leave the county without permission. Others he acknowledged were not that big a deal. Doss also testified he would not have pled guilty if he had known he would have to undergo SOTP upon being paroled from prison.[1] Doss added that "you can't start your life over with those rules. It doesn't make it possible in any way, shape or form."

Doss conceded that he had violated the SOTP rules—as noted, within a month of being paroled—and had ended up back in prison on his second parole revocation. When asked what he did to end up back in prison, Doss replied, "I had a girlfriend and Internet." Doss acknowledged that at the time of revocation he was still going through SOTP.

The district court denied Doss's application on the merits. It concluded Doss's plea counsel did not have to inform Doss of the *rules* of his special sentence, as opposed to the existence of the special sentence itself, because these rules constituted indirect and collateral consequences. Also, even assuming Doss's counsel breached an essential duty by failing to inform him Doss of the rules, the court determined Doss could not show a reasonable probability that he would have insisted on going to trial. As the court noted, the plea agreement resulted in the dismissal of other charges, and Doss received assurance the State would

---

[1]As noted, Doss acknowledged he started but did not complete SOTP in prison.

not seek prison if the presentence investigation recommended probation. Finally, the district court rejected Doss's constitutional challenges to the special sentence parole and SOTP rules, noting Doss "cite[d] no persuasive authority" to support his challenges.

Doss appealed. We transferred the case to the court of appeals, which affirmed the district court judgment. Doss applied for further review, and we granted his application.

## II. Standard of Review.

We generally review a district court's denial of an application for postconviction relief for errors at law. *Moon v. State*, 911 N.W.2d 137, 142 (Iowa 2018). Our review is de novo "[w]hen the basis for relief implicates a violation of a constitutional dimension." *Id.*

## III. Analysis.

**A. Ineffective Assistance of Plea Counsel Claim.** Doss argues his plea counsel was ineffective because counsel did not adequately inform Doss of the extent of the special sentence's rules and requirements at the time of Doss's 2007 plea. To establish ineffective assistance of counsel, Doss must demonstrate his plea counsel "failed to perform an essential duty" that resulted in prejudice. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006), *superseded in part by statute on other grounds*, 2019 Iowa Acts ch. 140, §§ 28, 31 (codified at Iowa Code §§ 814.6(1)(a), .7 (2020)), as recognized in *State v. Tucker*, 959 N.W.2d 140, 153–54 (Iowa 2021). "Counsel breaches an essential duty when counsel makes such serious errors that counsel is not functioning as the advocate the Sixth Amendment guarantees." *State v. Ross*, 845 N.W.2d 692, 698 (Iowa 2014). "[T]o satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he or she would not have pleaded guilty and would have insisted on going to trial."

*Straw*, 709 N.W.2d at 138. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Ondayog*, 722 N.W.2d 778, 784 (Iowa 2006) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984)).

1. *Was there a duty to advise Doss of specific special sentence conditions at the time of the guilty plea?* Iowa Rule of Criminal Procedure 2.8(2)(*b*)(2) requires the sentencing court to ensure a defendant understands "[t]he mandatory minimum punishment, if any, and the maximum possible punishment provided by the statute defining the offense to which the plea is offered." This includes a determination that "the defendant understands the direct consequences of the plea," but "the court is not required to inform the defendant of all indirect and collateral consequences of a guilty plea." *State v. Carney*, 584 N.W.2d 907, 908 (Iowa 1998) (en banc) (per curiam). The distinction between direct and collateral consequences is "whether the result [of the consequence] represents a definite, immediate and largely automatic effect on the range of defendant's punishment." *Id.* (quoting *State v. Warner*, 229 N.W.2d 776, 782 (Iowa 1975) (en banc), *overruled on other grounds by State v. Morrison*, 323 N.W.2d 254, 256 (Iowa 1982)).

Thus, in *Carney*, we held that driver's license revocation for an operating-while-intoxicated conviction was not a direct consequence of the guilty plea because it was nonpunitive. *Id.* at 908–09. Its purpose, rather, was to "to protect the public by providing that drivers who have demonstrated a pattern of driving while intoxicated be removed from the highways." *Id.* at 909 (quoting *State v. Moore*, 569 N.W.2d 130, 132 (Iowa 1997)). On the other hand, in *State v. Fisher*, we held that driver's license revocation for a person convicted of a drug possession offense was "mandatory, immediate, *and part of the punishment for that offense.*" 877

N.W.2d 676, 684 (Iowa 2016) (emphasis added). Accordingly, we determined that "the court must inform the defendant of this consequence before accepting his or her plea." *Id.*[2]

Doss's special sentence of lifetime parole is part of his criminal sentence and could subject him to additional imprisonment; therefore, he had the right to be informed of it before his guilty plea. *See* Iowa R. Crim. P. 11(2)(*b*)(2) (requiring that the defendant be informed of the mandatory minimum punishment and the maximum possible punishment); *State v. Hallock*, 765 N.W.2d 598, 605–06 (Iowa Ct. App. 2009) (holding defendant's special sentence under chapter 903B "is not merely collateral" and defendant "should have been informed of the provision before the court took his plea"). Doss acknowledges he received this disclosure, but he contends the district court had an added obligation to inform him of the parole rules he would have to follow when he began his special sentence because they were also a direct consequence of his guilty plea. Thus, Doss maintains that he entered his guilty plea unknowingly and involuntarily and that his plea counsel was ineffective for failing to ensure he was informed of the rules of his special sentence before he entered his plea.

We disagree. The district court has the initial authority and the obligation to impose Doss's special sentence under Iowa Code section 903B, but the same is not true of the underlying rules and conditions of Doss's parole supervision. *See id.* at 605. These are determined by the

---

[2]In *Fisher*, our court unanimously recognized and applied the distinction between direct and collateral consequences of a guilty plea. *See* 877 N.W.2d at 683 ("We must determine whether this mandatory license suspension is a direct or a collateral consequence of a guilty plea for possession of a controlled substance."). Furthermore, Doss does not challenge the direct–collateral distinction on appeal. Rather, he states, "[T]his Court should find that the rules of Applicant's special sentence were a direct consequence of entering his plea and trial counsel and the Court failed to advise him of the rules."

board of parole (BOP), the department of corrections (DOC), and the district department of correctional services (DDCS). *See* Iowa Code §§ 903B.1, 906.1(1)(*a*), .3, .5(4). The BOP establishes and approves the standard conditions, and any special conditions "shall only be imposed in accordance with the needs of the case as determined by the judicial district department of corrections, the department of corrections or the Iowa board of parole." Iowa Admin. Code r. 201—45.2(2); *see also Hill v. Lockhart*, 731 F.2d 568, 570 (8th Cir. 1984), *aff'd by an equally divided court en banc*, 764 F.2d 1279 (8th Cir. 1984), *aff'd*, 474 U.S. 52, 106 S. Ct. 366 (1985) ("The details of parole eligibility are considered collateral rather than direct consequences of a plea, of which a defendant need not be informed before pleading guilty").

Other courts have declined to treat parole rules and conditions as a required part of the guilty plea colloquy. In *People v. Monk*, the New York Court of Appeals held that the consequences of violating postrelease supervision were collateral consequences that did not have to be disclosed at the time of the plea. 989 N.E.2d 1, 4 (N.Y. 2013). That court explained in part,

> First, the consequences of violating postrelease supervision are uncertain at the time of the plea, depending, as they do, upon how a defendant acts in relation to a condition tailored to his circumstances and imposed in the future. Thus, such consequences are properly described as "peculiar" to the individual. Second, the New York State Board of Parole—not the courts—is responsible for establishing the conditions of a defendant's postrelease supervision.

*Id.*

In *Denson v. United States*, the District of Columbia Court of Appeals considered a sex offender's argument that his trial counsel had been ineffective for failing to disclose the offender would be prohibited from

associating with minors as a condition of his supervised release. 918 A.2d 1193, 1194–95 (D.C. 2006). The court rejected the argument, reasoning:

> Under District of Columbia law, discretionary conditions of supervised release, such as the one at issue, are imposed not by the trial court, but by an independent administrative agency, the U.S. Parole Commission, which has statutory discretion to impose "any condition . . . it considers to be appropriate." Therefore, while the imposition of a condition prohibiting contact with minors may, as appellant alleges, be a "predictable" part of supervised release for an offender convicted of child sexual abuse, it is not "absolutely part and parcel to the sentence itself," nor does it "have a definite and immediate impact on the range of defendant's *punishment.*"

*Id.* at 1195 (citations and footnote omitted).

The Nevada Supreme Court has held that the fact of lifetime supervision is a direct consequence of conviction that must be disclosed. *Palmer v. State*, 59 P.3d 1192, 1196–97 (Nev. 2002) (per curiam). But that court has also held that parole conditions prohibiting certain sex offenders from using the internet without approval or being within 500 feet of a public park without approval are collateral consequences and need not be disclosed. *Quilici v. State*, No. 57275, 2011 WL 2750975, at *1 (Nev. July 14, 2011); *see also Morales v. State*, 104 S.W.3d 432, 436–37 (Mo. Ct. App. 2003) (holding the possibility of civil commitment if a defendant was deemed a sexually violent predator was collateral and thus did not need to be disclosed prior to defendant's guilty plea because various procedures, including a probable cause hearing and trial, had to occur before the defendant could face civil commitment); *State ex rel. Sweeney v. Farey*, No. 2005AP1443, 2006 WL 1169639, at *1 (Wis. Ct. App. May 4, 2006) ("[B]ecause the decision to place Sweeney on electronic monitoring was made by an administrative agency rather than the court, it constituted a collateral rather than a direct consequence of his plea.").

Not only did the district court lack the authority to impose any conditions on Doss's supervision, but it also could not definitively know what those conditions would be at the time of Doss's plea. A district court need not advise defendants of "[c]onditions—general, special, or otherwise—which are presently inapplicable because they depend solely on the occurrence of future contingencies" prior to their guilty plea. *State v. Henderson*, 797 P.2d 725, 726 (Ariz. Ct. App. 1990) (holding the district court was not required to inform defendant prior to his guilty plea that his earliest date of parole eligibility could be extended if he violated correctional institution rules because that possibility was dependent upon "contingencies which had yet to occur" and was not a circumstance that existed at the time of the plea); *see also Craig v. People*, 986 P.2d 951, 963 n.9 (Colo. 1999) (en banc) ("Although the mandatory parole requirement is itself a direct consequence of the guilty plea, the potential for transformation of the mandatory period into [an additional period of imprisonment] is not an immediate and automatic result of pleading guilty. Rather, such an outcome requires an affirmative action on the part of the offender—i.e., a parole violation—and is therefore a collateral consequence of the plea which need not be described at the providency hearing."). As the United States Supreme Court has explained,

> [W]here parole is concerned[,] discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised. The idea of discretion is that it has the capacity, and the obligation, to change and adapt based on experience. New insights into the accuracy of predictions about the offense and the risk of recidivism consequent upon the offender's release, along with a complex of other factors, will inform parole decisions.

*Garner v. Jones*, 529 U.S. 244, 253, 120 S. Ct. 1362, 1369 (2000).

Doss's parole officer testified that his conditions were subject to change, and the rules of SOTP were typically only "intact for a time period

until evaluations and assessments" allowed a psychologist to decide whether the participant needed further programming or not. In signing his SOTP agreement, Doss specifically agreed "to abide by all conditions as stated in this contract throughout my duration of my supervision unless I obtain documented approval for any changes, additions or amendments by my [parole officer], Board of Parole (when required) and SOTP team."[3] The other conditions of Doss's parole were also dependent upon decisions made by the BOP, the DOC, and the DDCS. *See* Iowa Admin. Code r. 201—45.2(2) (authorizing additions to and deletions from the standard conditions). Thus, the district court could not have known the conditions of Doss's lifetime parole because they were tailored to Doss's needs and subject to change. *See State v. Graham,* 897 N.W.2d 476, 490–91 (Iowa 2017) (rejecting a challenge to a lifetime special sentence as cruel and unusual without an actual copy of the parole agreement).

Given that they were deferred, variable, and under the control of a third party, the conditions of Doss's parole do not fall within the sort of "definite, immediate and largely automatic effect on the range of defendant's punishment" that we classify as a direct consequence of a plea. *Carney,* 584 N.W.2d at 908 (quoting *Warner,* 229 N.W.2d at 782). Hence, Doss's guilty plea was knowing and voluntary, and any alleged failure of Doss's plea counsel to inform him of these collateral consequences does not constitute a breach of an essential duty. *Carney,* 584 N.W.2d at 910 ("The failure to advise a defendant concerning a collateral consequence, even serious ones, cannot provide a basis for a claim of ineffective assistance of counsel.").

---

[3]Additionally, SOTP only became a condition of parole for Doss because he did not successfully complete it in prison.

Finally, it should be noted that Doss's special parole agreements of August 15, 2015, and October 28, 2016, were three single-spaced pages long apiece—and they differed from each other in certain respects. Doss's October 31, 2016 SOTP agreement took up two single-spaced pages. Requiring disclosure of these terms and conditions at the 2007 plea hearing would have required considerable soothsaying and speedreading skills. Even with direct, punitive consequences, we require disclosure only of the maximum and minimum punishments, not all possible permutations. *See* Iowa R. Crim. P. 2.8(2)(*b*)(2); *State v. Weitzel*, 905 N.W.2d 397, 408 (Iowa 2017).

2. *Did Doss's plea counsel give Doss incorrect information about the special sentence?* Alternatively, even if the conditions of Doss's special sentence are deemed collateral, Doss claims his plea counsel was ineffective because he misinformed him about the nature of the special sentence. *See Stevens v. State*, 513 N.W.2d 727, 728 (Iowa 1994) (per curiam) ("The rule is well established that defense counsel does not have a duty to inform a defendant about the collateral consequences of a guilty plea, but commits reversible error if counsel misinforms the defendant as to these consequences."). Doss testified his plea counsel told him "[the special sentence] was used as a monitoring thing. As long as I followed the actual law, I would be okay."

On our de novo review, we do not accept Doss's claim that he was misinformed about the consequences of the special sentence. The record at the 2007 sentencing tends to undermine this assertion. Counsel stated on the record that Doss would have to go through SOTP that would be "very strenuous and very rigorous." Also, at sentencing, the victim's mother explained her daughter would have preferred that Doss receive some prison time. Wistfully, the mother said her daughter had indicated

that "if this ever happened to her again, she would never speak out and she would probably never suggest for other girls to speak out, because, look, nothing's going to happen anyway." The mother continued, though, "I did explain to [her] *the severity of the lifetime probation* and the sex offender registry, to try to ease her thinking . . . ." (Emphasis added.)

Further, the court emphasized to Doss at his 2007 sentencing that he "will also be subject to whatever further terms and conditions that your probation officer feels are appropriate" and that Doss will be "on probation for the rest of his life." The court also told Doss he could end up in prison if he "fail[ed] to participate appropriately" in SOTP. Thus, Doss's claim that he was misled by his counsel and later blindsided by the parole and SOTP agreements does not ring true in light of everything that was said at sentencing. On our de novo review, we reject that claim.

Even if counsel had breached an essential duty by failing to adequately inform Doss of the consequences of his guilty plea, Doss has now shown a reasonable probability that he would not have pled guilty but for counsel's errors. *See Straw*, 709 N.W.2d at 138 ("[T]o satisfy the prejudice requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he or she would not have pleaded guilty and would have insisted on going to trial."). We agree with the district court's conclusion on this point. The only evidence that Doss would have insisted on going to trial instead of pleading guilty are his self-serving answers to leading questions. The following is one example:

> Q. Did you know prior to pleading guilty that one of the rules of special sentence was going to be that you were going to have a curfew? A. No, I did not.

> Q. Would that have affected your decision to plead guilty? A. It would have. I would not have pled.

The parole agreement actually states that Doss has to obey a curfew *if* one is imposed. Furthermore, it is hard to credit Doss's claim that the possible terms of his special sentence and SOTP agreements down the road would have made a difference in his plea decision given that Doss promptly violated the terms of his probation. The circumstantial evidence indicates Doss was preoccupied with the present, not the future, not even the immediate future. Doss wanted to walk out of the courtroom on the date of his sentencing. As the Supreme Court has said,

> Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences.

*Lee v. United States*, 582 U.S. ___, ___, 137 S. Ct. 1958, 1967 (2017).

Moreover, Doss does not deny that he committed the offense to which he pled guilty in 2007. At sentencing, the district court stated on the record that if Doss had taken the case to trial and been convicted, he would have been sent to prison. And a conviction would have resulted in the same lifetime special sentence. *See* Iowa Code § 903B.1. Doss also avoided three other charges by pleading guilty. Doss does not assert that he had a defense to any of the charges. Like the district court, we are not convinced that Doss would have taken this case to trial. Accordingly, for this reason as well, we reject Doss's claim that his plea counsel was constitutionally ineffective.

**B. Constitutionality of the Rules Governing Doss's Parole and SOTP.** We now turn to Doss's claim that the parole and SOTP rules are unconstitutional as applied to him. On appeal, he specifically challenges rules restricting his internet use, dating, church attendance, independent counseling, and contact with minors. Doss argues these rules violate his

freedom of speech and freedom of association under the First Amendment to the United States Constitution and article I, section 7 of the Iowa Constitution.[4] Doss asks that his parole revocation be reversed, that he be released from prison, and that these restrictions be removed.

1. *Error preservation.* The State first points out that Doss failed to challenge the restrictions on internet use below. We agree. Doss did not testify below that he objected to these restrictions. They are not discussed in Doss's pretrial brief, his posttrial brief, or the district court's ruling. Doss did not preserve error.[5]

Additionally, the State points out that an administrative proceeding and not a PCR proceeding is the appropriate way to challenge a parole agreement. *See* Iowa Admin. Code 205—15.1 ("An inmate, parolee, or work releasee may appeal any action of the [BOP] staff or [the BOP] that affects that person" subject to certain exceptions); *id.* r. 201—45.2 (establishing the BOP's authority to impose conditions of parole); *Frazee v. Iowa Bd. of Parole*, 248 N.W.2d 80, 82–83 (Iowa 1976) (holding parole board is an agency subject to chapter 17A).

Yet the State failed to raise this argument below. In fact, the State filed no papers whatsoever in opposing to Doss's PCR application, not even

---

[4]Doss also says in passing that the challenged rules violate his "right to be free from cruel and unusual punishment, in violation of the Eighth Amendment and article I, section 17 of the Iowa Constitution," and his rights "under the Fifth and Fourteenth Amendments, as well as article I, section 9 of the Iowa Constitution as they deprive him of liberty and property without due process of law and are unreasonable, arbitrary, and capricious." However, Doss provides no further explanation or analysis in support these arguments. "We will not speculate on the arguments [Doss] might have made and then search for legal authority and comb the record for facts to support such arguments." *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996). We deem these arguments waived on appeal.

[5]The court of appeals also found that error was not preserved.

an answer.[6]  We have characterized the issue of whether a prisoner must bring a PCR action or bring an administrative proceeding as involving authority to hear a case and not subject matter jurisdiction.  *See Franklin v. State*, 905 N.W.2d 170, 172 (Iowa 2017) ("Although a court may have subject matter jurisdiction, it may lack the authority to hear a particular case for one reason or another." (quoting *In re Est. of Falck*, 672 N.W.2d 785, 789–90 (Iowa 2003))); *see also City of Des Moines v. Des Moines Police Bargaining Unit Ass'n*, 360 N.W.2d 729, 731–33 (Iowa 1985) (en banc) (explaining the district court lacked the authority to entertain a declaratory judgment action even though it had subject matter jurisdiction because the party seeking declaratory action had not exhausted all administrative remedies).  So it appears the State could waive its argument by not asserting it below.  *State v. Davis*, 581 N.W.2d 614, 616 (Iowa 1998) (per curiam) (noting "an impediment to the court's authority can be obviated by consent, waiver or estoppel").  Still, the economies taken by the State in defense of this case may not make a difference here.  As Doss has clarified in his supplemental appellate brief, Doss is challenging the parole and SOTP conditions as applied to him and as they resulted in his parole revocation.  He recognizes that he is bringing a PCR application under Iowa Code section 822.2(1)(*e*).  *See* Iowa Code § 822.2(1)(*e*) (2017) (authorizing a PCR application where "parole . . . has been unlawfully revoked").  In his attorney's words:

> [B]ecause Doss is not challenging the facial validity of any IBOP policies, but rather, his ongoing incarceration as a result of revocation of parole, PCR is the appropriate procedural mechanism, and the IBOP's argument that he should have been required to pursue an administrative action under Iowa Code Chapter 17A is meritless.

---

[6]The county attorney stated at the hearing that he would be filing a posthearing brief, but he did not do so.

So the relevant question is whether Doss's parole was revoked because he violated unconstitutional parole or SOTP conditions. We do not consider the *general* propriety of these terms or whether they should be included in a *future* parole or SOTP agreement. Instead, we must decide whether they indelibly taint Doss's parole revocation.[7]

Doss argues that the conditions as applied to him violated both the First Amendment of the United States Constitution and article I, section 7 of the Iowa Constitution. Although he contends that both the United States and Iowa Constitutions were violated, Doss only advances *one* constitutional standard. Thus, Doss relies exclusively on federal constitutional authority except for *State v. Aschbrenner,* 926 N.W.2d 240 (Iowa 2019). In *Aschbrenner,* we decided that an internet identifier reporting requirement for sex offenders did not violate either the First Amendment or article I, section 7. *Id.* at 254. We applied the same federal standard to both claims. *Id.*

In recent years, our court has developed an approach for the situation when a party asserts violations of parallel provisions of the United States and Iowa Constitutions but does not offer a separate Iowa constitutional analysis. In this circumstance, our court has considered the federal and state constitutional claims simultaneously, applying the federal standards to the state constitutional claim but reserving the right to apply them in a manner different from federal precedent. *See, e.g., State*

---

[7]A case worth noting is *State v. Graham,* 897 N.W.2d 476. There we rejected a constitutional challenge brought by a juvenile offender who had been convicted of third-degree sexual abuse and would be subject to a special lifetime sentence. *Id* at 477–78. We noted that the offender had failed to develop a record as to the impact on him of the only rule he specifically challenged—the 2000-foot rule. *Id.* at 489. We also noted that the offender had no "injury in fact" from that rule because he was currently in custody. *Id.*

*v. Warren*, 955 N.W.2d 848, 859 (Iowa 2021); *State v. Lyon*, 862 N.W.2d 391, 398 (Iowa 2015); *State v. Tyler*, 830 N.W.2d 288, 291–92 (Iowa 2013).

The special concurrence criticizes this approach and maintains that the state constitutional claim should be *forfeited*.  Regardless of the merits of our current approach, forfeiture seems wrong.  Here, Doss clearly asserted both federal and state constitutional claims, even though he presented only one constitutional standard.[8]

"[A]n as-applied challenge alleges the statute is unconstitutional as applied to a particular set of facts" as opposed to a "facial challenge . . . in which no application of the statute could be constitutional under any set of facts."  *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 764 (Iowa 2019) (quoting *Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 231 (Iowa 2018)).  At issue are the rules relating to dating, contact with minors, church attendance, and independent counseling.

2.  *The grounds for Doss's latest parole revocation.*  In this case, the sentencing court placed Doss on probation and ordered Doss in 2007 to complete SOTP until he achieved "maximum benefits" due to his admission that had committed a serious sexual offense against a thirteen-year-old girl.  Fourteen years later, Doss has still not completed SOTP.  Instead, Doss has struggled.  He has gone through probation and parole revocation (twice) and served substantial time in prison.  Doss's poor track record is relevant where, as here, the question is whether the restrictions were constitutional as applied to Doss for purposes of revoking his latest parole.

---

[8]This is not an either-or situation involving the law of two geographically distinct sovereigns (such as Iowa and Minnesota).  In that circumstance, only one state's law would actually govern.  Here, by contrast, the State is constrained by both the United States and the Iowa Constitutions.  Although we encourage parties to present a separate analysis under the Iowa Constitution whenever appropriate, a party is entitled to put forward the same analysis in support of both federal and state claims.

On October 31, 2016, Doss signed the SOTP agreement in which he agreed not to the use the internet, not to possess or view sexually explicit materials, not to participate in outside counseling, not to attend church, not to have contact with minors, and not to pursue dating or sexual relationships. All conditions would be in effect for the duration of SOTP "unless [Doss] obtain[ed] documented approval" from his parole officer or another authorized person.

Doss's parole violation report was dated December 19. It recorded a series of violations that had occurred during November, as soon as Doss had been discharged from the correctional facility. Doss had an unexcused absence from SOTP on November 10. Also, Doss was found to be visiting a "risqué dating site" entitled "Plenty of Fish," searching for "16–20 year old women on women" on YouTube, and accessing "naughtydate.com." Doss was "accessing numerous sites that are pornographic." The report noted that Doss had not been given permission to access these sites and they were "not relevant to [his] current employment or job searches."

Moreover, Doss admitted being in a sexual relationship with an ex-offender who was staying with him at a hotel. Doss was photographed holding her two-year-old son on November 11. Regarding this child, Doss had sent a text message, "Would you let me adopt [name of child] in court so he can have a Dad that will be able to take care of him you know I love him like my own son." Another ex-offender also had stayed in a hotel room with Doss. The report explained, "Both of these individuals have criminal records and [Doss] has not received permission to be around them."

None of the alleged parole violations related to church attendance or independent counseling. Therefore, we do not consider these rules. We also do not consider the internet restrictions because they were not

challenged below.[9]  The remaining rules at issue relate to dating and contact with minors.  The record indicates Doss's parole was revoked in part because he pursued dating and sexual relationships with two ex-offenders, sought additional dating opportunities online, and had contact with the two-year-old child of one of his dating partners.

3.  *Constitutionality of the dating restriction as applied to Doss.*  "The First Amendment embodies the freedom of association, the right to 'enter into and maintain certain intimate human relationships [without] undue intrusion by the State."  *Baker v. City of Iowa City*, 867 N.W.2d 44, 52 (Iowa 2015) (alteration in original) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18, 104 S. Ct. 3244, 3249 (1984)).  However, this freedom is not absolute, as restrictions on the rights of parolees to associate with certain categories of people are a recognized part of the criminal justice system.  *See, e.g., Morrissey v. Brewer*, 408 U.S. 471, 478, 92 S. Ct. 2593, 2598 (1972) (describing "associations or correspondence with certain categories of undesirable persons" as a typical condition of parole).  "[P]arole necessarily involves intrusion by government into the lives of parolees as they assimilate back into society."  *State v. King*, 867 N.W.2d 106, 121 (Iowa 2015).  Otherwise, "the goal and purpose of parole would be difficult, if not impossible, to accomplish."  *Id.* at 122.

---

[9]In *Packingham v. North Carolina*, the United States Supreme Court struck down a law that prohibited registered sex offenders from accessing social media, stating, "[T]o foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights."  582 U.S. ___, ___, 137 S. Ct. 1730, 1737 (2017).  The Court added, however,

> Though the issue is not before the Court, it can be assumed that the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor.

*Id.* at ___, 137 S. Ct. at 1737.  In *Aschbrenner*, we upheld an Iowa law that requires sex offenders to provide their internet *identifier*.  926 N.W.2d at 254.

"When granting parole, the board of parole does not grant an inmate 'the absolute liberty to which every citizen is entitled, but only . . . the conditional liberty properly dependent on observance of special parole restrictions.' " *Id.* at 121 (omission in original) (quoting *Morrissey*, 408 U.S. at 480, 92 S. Ct. at 2600). Consequently, a parolee may be subject to restrictions on otherwise lawful activities. *Morrissey*, 408 U.S. at 481–82, 92 S. Ct. 2600–01 (holding a parolee is properly subjected to "restrictions not applicable to other citizens"). Although our court has not set forth a standard for reviewing restrictions upon a parolee's constitutional right to freedom of association, federal courts generally review these restrictions by examining whether the restrictions are "reasonably and necessarily related to the Government's legitimate interests in the parolee's activities," *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972), and "entail 'no greater deprivation of liberty than is reasonably necessary' to achieve" the goals of rehabilitation and public protection. *United States v. Roy*, 438 F.3d 140, 144 (1st Cir. 2006) (quoting *United States v. York*, 357 F.3d 14, 20 (1st Cir. 2004)); *cf. United States v. Turner*, 44 F.3d 900, 903 (10th Cir. 1995) ("Courts have consistently upheld imposition of conditions of probation that restrict a defendant's freedom of speech and association when those conditions bear a reasonable relationship to the goals of probation."); *United States v. Bortels*, 962 F.2d 558, 560 (6th Cir. 1992) (per curiam) ("This Circuit mandates that where a condition of supervised release is reasonably related to the dual goals of probation, the rehabilitation of the defendant and the protection of the public, it must be upheld."); *United States v. Bolinger*, 940 F.2d 478, 480 (9th Cir. 1991) ("The restriction on [probationer's] association rights is valid if: (1) primarily designed to meet

the ends of rehabilitation and protection of the public and (2) reasonably related to such ends.").

The only case Doss discusses in support of his challenge to his dating restriction is *United States v. Behren*, 65 F. Supp. 3d 1140 (D. Colo. 2014), but that case actually supports the opposite conclusion. There, the defendant argued the restriction in his sex offender treatment contract establishing "relationships and dating may be completely or partially restricted until RSA staff determines that a particular situation/relationship is safe" violated his First Amendment right to association. *Id.* at 1157. The district court rejected this argument, explaining,

> While in treatment, it is reasonable and relevant for treatment providers to closely review dating relationships, which potentially may involve sex. Sex offender treatment need not be limited to the particular type of sex offense for which a defendant was convicted. Thus, this provision is not, on its face, a greater deprivation of liberty than is necessary nor is it necessarily an undue infringement of the right of association, a right which routinely and necessarily is severely limited by a sentence in a criminal case.

*Id.*

The court acknowledged "a total ban on dating may constitute a greater restriction on liberty than is necessary or a violation of the First Amendment right to association," but that did not appear to be true in the defendant's situation because his agreement provided a procedure for him to obtain approval of dating relationships. *Id.* at 1157. However, the court concluded the defendant's objection to his contract was not ripe for review because the actual scope of the dating restriction on the defendant was "not yet known" since the defendant never sought approval to date anyone. *Id.* at 1158.

This case involves similar circumstances. The dating restriction was only in Doss's SOTP agreement, not his parole agreement. Had Doss completed SOTP, he would not even be subject to this restriction. As in *Behren*, the restriction on dating was a part of the offender's treatment, which "need not be limited to the particular type of sex offense for which a defendant was convicted." *Id.* at 1157. The record does not indicate that Doss would have been prohibited from any dating whatsoever had he sought permission. To the contrary, the parole officer testified that Doss could have asked for an amendment to his treatment plan to have a girlfriend. Instead of seeking permission, Doss immediately invited an ex-offender to sojourn with him at a hotel. The parole violation report states that Doss "has not received permission, nor had a conversation with his [parole officer] about this person," again implying the possibility of permission being granted for a dating relationship. Meanwhile, through "Plenty of Fish," Doss was attempting to start an unauthorized online relationship with an individual who appeared to be younger.

We conclude that the dating restriction, limited to the duration of SOTP and with the ability to request modification, did not result in an unconstitutional deprivation of Doss's associational rights in this case. The restriction is reasonably related to legitimate government interests and does not involve "a greater deprivation of liberty than is necessary" such that it amounts to "an undue infringement of the right of association, a right which routinely and necessarily is severely limited by a sentence in a criminal case." *Id.*

4. *Constitutionality of the restriction on contact with minors as applied to Doss.* Additionally, Doss was prohibited from having contact with minors without approval. Doss complained that he got in trouble for holding the two-year-old son of his girlfriend. This assertion needs to be

put in context. The girlfriend was an ex-offender staying with him at the hotel immediately after his release. Within two weeks of obtaining his freedom, Doss was photographed holding the child and was texting, "Would you let me adopt [name of the child] in court so he can have a Dad that will be able to take care of him you know I love him like my own son."

This conduct is troubling, not because there appeared to be a risk that Doss would sexually abuse the child but because Doss could be using the child as a pawn while pursuing and engaging in a sexual relationship with the child's mother. Reasonable people can question whether that was healthy or appropriate; certainly, it might interfere with SOTP.

We conclude that the restriction on contact with minors, limited to the duration of SOTP and with the ability to request modification, did not deprive Doss of his constitutional freedom of association in this case.[10]

We take note of our decision in *State v. Lathrop*, 781 N.W.2d 288 (Iowa 2010). There we struck from a probation agreement a prohibition on the defendant having any contact with minors without prior approval of the probation officer. *Id.* at 291. As here, the defendant had been convicted of a sex offense involving a minor. *Id.* Without discussing constitutionality, we said that this condition was unreasonable and an abuse of discretion because it "literally prohibits any and all contact with any person under the age of eighteen regardless of how unintended, incidental, or innocuous such contact might be unless the defendant has obtained permission from his supervising officer." *Id.* at 299–300. We

---

[10]The prohibition on contact with minors without prior approval, unlike the others challenged by Doss, was part of the parole agreement as well as the SOTP agreement. Thus, it was not on its face limited to the duration of SOTP. However, the violation in this case occurred while Doss was in SOTP, only two weeks after his supervised release. Therefore, for purposes of this appeal, we need only address whether a temporary ban on contact with minors while Doss was in SOTP and with the ability to seek exceptions from his parole officer, was constitutional as applied to Doss. We conclude that it was.

worried that "[a] walk to the local fast food restaurant may place the defendant in contact with children playing on the sidewalk, the paper boy delivering newspapers, or an underage clerk taking payment for his purchase." *Id.* at 300. After suggesting that the main problem was the bar on incidental contact,[11] we remanded for the district court "to fashion a more realistic and precise condition on the defendant's probation that would ensure he does not have contact with minors in situations that would jeopardize the safety of the community and the defendant's rehabilitation." *Id.* at 299–301.

Here, however, the issue is somewhat different. We have to decide whether a restriction on contact with minors in an SOTP agreement, as applied to a recidivist parolee and the nonincidental contact that occurred in this case, is unconstitutional. An SOTP agreement as part of parole from incarceration is different from a probation agreement; in the former situation, the offender is emerging from having been incarcerated. "Historically, corrections officials have been given broad discretion with respect to the role parole rightly plays in an individual prisoner's constructive reintegration into society." *Larsson v. Iowa Bd. of Parole*, 465 N.W.2d 272, 275 (Iowa 1991); *see also State v. Baldon*, 829 N.W.2d 785, 844 (Iowa 2013) (Mansfield, J., dissenting) (discussing parole agreements). "[O]n the Court's continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers." *Samson v. California*, 547 U.S.

---

[11]We said, "Certainly, given the circumstances of the defendant's offense, it is reasonable for the court to restrict the defendant's interaction with minors." *Lathrop*, 781 N.W.2d at 299. We also contrasted the case before us with *State v. Hall*, where the court of appeals had upheld a condition of probation that prohibited contact with minors "because the restriction contain[ed] an exception for 'incidental contact in public places where other responsible adults are present' " *Id.* at 300 (alteration in original) (quoting *State v. Hall*, 740 N.W.2d 200, 204 (Iowa Ct. App. 2007)).

843, 850, 126 S. Ct. 2193, 2198 (2006) (omission in original) (quoting *United States v. Cardona*, 903 F.2d 60, 63 (1st Cir. 1990)). The "State has an 'overwhelming interest' in supervising parolees because 'parolees . . . are more likely to commit future criminal offenses.' " *Id.* at 853, 126 S. Ct. at 2200 (omission in original) (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 365, 118 S. Ct. 2014, 2020 (1998)). Not only was the contact here nonincidental, but it was connected to a sexual relationship with the child's mother that separately violated the conditions of SOTP.

Other courts have upheld sex offender treatment conditions or supervised release conditions restricting association with minors to protect children and promote the offender's rehabilitation. *See United States v. Pennington*, 606 F. App'x 216, 222 (5th Cir. 2015) (upholding a special release condition that the defendant, a convicted sex offender, not date anyone with minor children without advance approval); *United States v. Ellis*, 720 F.3d 220, 226 (5th Cir. 2013) (per curiam) (upholding the condition of defendant's supervised release preventing him from dating anyone who has children under the age of eighteen years old without prior approval of his probation officer because the restriction was reasonably related to the public safety goal of protecting children); *United States v. Levering*, 441 F.3d 566, 569–70 (8th Cir. 2006) (upholding a special release condition that prohibited the defendant, who was convicted of raping a thirteen-year-old girl, from having contact with juvenile females unless approved in advance by his probation officer); *United States v. Bee*, 162 F.3d 1232, 1235–36 (9th Cir. 1998) (upholding a special release condition that barred a defendant who had sexually abused a six-year-old child from having unapproved contact with children); *but see United States v. Duke*, 788 F.3d 392, 403 (5th Cir. 2015) (per curiam) (striking down an absolute lifetime ban on contact with minors imposed on an individual convicted of receiving child pornography).

As the United States Court of Appeals for the First Circuit summarized,

> [A]ssociational conditions [on interactions with minors] may be proper where the defendant has recently committed a sex offense against a minor, *or* where the intervening time between a prior sex offense and the present conviction is marked by substantial criminal activity, *or* where the defendant's conduct otherwise indicates an enhanced risk to minors.

*United States v. Pabon*, 819 F.3d 26, 31 (1st Cir. 2016). It also noted such conditions are generally " 'sufficiently circumscribed' when they do not place an outright ban on association with minors, but only curtail association, such as by requiring pre-approval by the probation officer or another authority." *Id.* at 31–32.

As applied in this case, to a parolee who had committed sexual abuse against a minor, who was undergoing SOTP, and who was engaged in intentional contact with a minor in the hope of advancing an otherwise prohibited dating relationship with the child's mother, the condition was reasonably necessary to the offender's rehabilitation and therefore constitutional.

***

We end this opinion with a final note. Since *Packingham v. North Carolina*, 582 U.S. \_\_\_, 137 S. Ct. 1730, there have been a host of court decisions dealing with supervised release conditions that broadly limit Internet use.[12] The results in these cases have been mixed. Although we

---

[12]*See, e.g.*, *United States v. Bobal*, 981 F.3d 971, 977–78 (11th Cir. 2020) (holding a district court did not commit plain error by imposing a restriction on computer use as a special condition of lifetime supervised release, noting the restriction did not completely bar the appellant's exercise of First Amendment rights because the appellant could obtain court permission to use the computer in connection with employment or could seek modification of his supervised release for other reasons); *United States v. Carson*, 924 F.3d 467, 473 (8th Cir. 2019) ("Because supervised release is part of a defendant's sentence, *Packingham* does not render a district court's restriction on access to the internet during a term of supervised release plain error."); *United States v. Eaglin*, 913 F.3d 88, 94, 99 (2d Cir. 2019) (invalidating the appellant's condition of supervised release prohibiting him from "access[ing] the Internet from any computer or Internet-capable

conclude the issue is not properly before us today, it may return to us in the near future. We suggest that the amici who participated in this case keep their briefs handy on their computers.

## IV. Conclusion.

For the foregoing reasons, we affirm the judgment of the district court and the decision of the court of appeals.

**DECISION OF COURT OF APPEALS AND DISTRICT COURT JUDGMENT AFFIRMED.**

Christensen, C.J., and Waterman and McDermott, JJ., join in full and McDonald and Oxley, JJ., join in part. Appel, J., files a special concurrence. McDonald, J. files a special concurrence, in which Oxley, J., joins.

---

device in any location unless authorized by the Court or as directed by the U.S. Probation Office upon approval of the Court"); *United States v. Halverson*, 897 F.3d 645, 657–59 (5th Cir. 2018) (upholding a condition on supervised release that prohibited the appellant's use of the Internet and computer access unless approved in advance by the probation officer); *United States v. Rock*, 863 F.3d 827, 831 (D.C. Cir. 2017) (holding the district court did not commit plain error when it imposed a condition of supervised release preventing appellant "from possessing or using a computer, or having access to any online service, without the prior approval of the probation office"); *People v. Galley*, ___ N.E.3d ___, ___, 2021 WL 49953, at *1 (Ill. App. Ct. 2021) (finding a broad ban on accessing or use of social networking websites to be unconstitutional); *State v. R.K.*, 232 A.3d 487, 505 (N.J. Super. 2020) (striking down a prohibition on accessing social networking sites without authorization from the district parole supervisor as violating the free speech rights of a paroled sex offender); *State v. Johnson*, 460 P.3d 1091, 1098–100 (Wash. Ct. App. 2020) (holding appellant's supervised release condition restricting him from the Internet without approval from his community corrections officer was constitutionally permissible); *Mutter v. Ross*, 811 S.E.2d 866, 872–73 (W.Va. 2018) (determining that a broad ban on Internet use as a condition of parole was unconstitutional); *State v. King*, 950 N.W.2d 891, 898–909 (Wis. Ct. App. 2020) (holding conditions of defendant's extended supervision restricting his access to the Internet unless he received approval from a department of corrections supervising agent did not violate defendant's First Amendment rights).

**APPEL, Justice (concurring specially).**

I concur in result only. I write separately to explain why I cannot join the majority opinion and to emphasize the narrowness of the holdings in this case. With respect to the claim of ineffective assistance of counsel related to plea bargaining, I would decide the case based on the failure of Kenneth Doss to show prejudice required by the most recent United States Supreme Court caselaw. I would not proceed to explore the delicate and evolving question of what constitutes ineffective assistance of counsel in the context of plea bargaining in the post-*Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473 (2010), era. The majority's essay on the issue lacks historical perspective, does not recognize the position of the American Bar Association (ABA) and other professional organizations on the duties of counsel in the context of plea bargaining, and not only fails to grapple with *Padilla* but also largely relies on pre-*Padilla* cases in the opinion. The result is a collage of mechanical rules drawn from outdated cases that do not address the substantial issues facing a court considering ineffective-assistance-of-counsel claims in the plea bargaining context in the post-*Padilla* era. As will be seen below, in my view, the best approach to the duty of counsel to disclose the consequences of a plea is best reflected in the ABA standards which require disclosures of "collateral" consequences enmeshed with the criminal process that are severe and important enough to impact the decision to plead guilty.

**I. Issues Surrounding the Effectiveness of Counsel Regarding the Plea Bargain.**

**A. Introduction.** In this case, Doss claims that his counsel was ineffective for failure to provide him with the applicable rules for lifetime special sentences under Iowa Code section 903B.1 (2005). He raises his

claim under both the Sixth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution.

Doss does not advance a claim that the Iowa Constitution should be interpreted differently than its federal counterpart. The cases cited in Doss's brief are all cases under the Sixth Amendment. Under the circumstances, we apply the applicable federal standards, though we reserve the right to apply those standards in a fashion more stringent than in federal courts.

Under the caselaw, in order to show ineffective assistance of counsel, a defendant must show (1) breach of duty and (2) prejudice. *See, e.g., Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S. Ct. 2052, 2065 (1984); *State v. Dalton*, 674 N.W.2d 111, 119 (Iowa 2004). Guilty plea cases are often decided on the prejudice prong to avoid unnecessary pronouncements on constitutional issues. *Hill v. Lockhart*, 474 U.S. 52, 60, 106 S. Ct. 366, 371 (1985). In the context of a challenge to a guilty plea based on ineffective assistance of counsel, in order to show prejudice, we require that a defendant demonstrate "there is a reasonable probability that, but for counsel's errors, he or she would not have pleaded guilty and would have insisted on going to trial." *State v. Straw*, 709 N.W.2d 128, 138 (Iowa 2006), *superseded in part by statute on other grounds*, 2019 Iowa Acts ch. 140, §§ 28, 31 (codified at Iowa Code §§ 814.6(1)(*a*), .7 (2020)), *as recognized in State v. Tucker*, 959 N.W.2d 140, 153–54 (Iowa 2021). We do not require a mathematical 51% calculation, but only "a reasonable probability . . . sufficient to undermine confidence in the outcome." *State v. Ondayog*, 722 N.W.2d 778, 784 (Iowa 2006) (citations omitted) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

The United States Supreme Court, however, has recently provided guidance on the question of prejudice in the context of plea bargaining in

*Lee v. United States*. 582 U.S. ___, 137 S. Ct. 1958 (2017). In *Lee*, the defendant was an undocumented immigrant who pled guilty to federal drug trafficking charges that made him subject to mandatory deportation. *Id.* at ___, 137 S. Ct. at 1962–63. There was no question that his lawyer acted incompetently. *Id.* at ___, 137 S. Ct. at 1964. The only question was whether there was an adequate showing of prejudice. *Id.*

In *Lee*, the Court emphasized that the question is not whether the defendant would likely have won at trial but rather whether the defendant made an adequate showing that he would have opted to go to trial had he been properly advised. *Id.* at ___, 137 S. Ct. at 1965. While the Court noted his chances at trial were almost certainly very small, his chances after his plea bargain were essentially zero. *Id.* at ___, 137 S. Ct. at 1966–69.

Importantly, however, *Lee* also discussed the type of evidence required under the Sixth Amendment to show prejudice from failure to be properly advised about the consequences of a plea bargain. *Id.* at ___, 137 S. Ct. at 1967–69. According to *Lee*:

> Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences.

*Id.* at ___, 137 S. Ct. at 1967.

In Lee's case, the court found substantial and uncontroverted contemporaneous evidence that supported the defendant's claim of prejudice. *Id.* at ___, 137 S. Ct. at 1969. Lee repeatedly asked his counsel about the deportation consequence. *Id.* at ___, 137 S. Ct. at 1967–68. Further, his substantial ties to the United States and lack of ties to South Korea supported his claim. *Id.* at ___, 137 S. Ct. at 1968.

**B. Application of Prejudice Principles.** Turning to the case at hand, Doss did not deny that he committed the underlying offense. Except when an *Alford* plea is taken, admission of facts sufficient to support the underlying charge is routine in guilty plea settings. Thus, the fact that Doss made necessary statements to support a plea bargain is not a disqualifying event: it certainly was not in *Lee*.

But the bulk of the record in this case developed by Doss does not focus on contemporaneous events at the time of the plea but instead consists of post hoc assertions that he would have turned down the plea bargain had he known about the rules of his lifetime special sentence and Sex Offender Treatment Program (SOTP). But the Supreme Court in *Lee* urged lower courts not to solely rely on this type of evidence in finding prejudice. He has offered no substantial contemporaneous evidence supporting his claim.

The majority opinion in its analysis claims that Doss was concentrating on the present, not the future, when he plead guilty. I have found nothing in the record to support that supposition. But, the majority is closer to the mark when it points out that a conviction on any of the charged crimes would have resulted in a lifetime special sentence in any event. *See* Iowa Code § 903B.1. As part of the plea agreement, the State agreed to all other charges, allowed Doss to argue for a suspended sentence, and reserved the right to argue in favor of the sentence recommended in the presentence investigative report. But if the presentence report recommended probation, the State would not resist. These aspects of the contemporaneous record do not offer Doss support for his claim that he would have rejected the plea bargain had he been properly advised by his counsel.

Further, the contemporaneous record reveals that the district court told Doss that he would "also be subject to whatever further terms and conditions that your probation officer feels are appropriate" and that he would be "on probation for the rest of his life." He was also told he could end up in prison if he failed to participate appropriately in SOTP. These phrases do not reveal the substance of potential conditions, but they do reveal that at the time Doss pled guilty he was aware of the fact of future conditions. That general awareness of the fact of future conditions does not support Doss's claim that he would have rejected the plea had he known the details.

That is all there is in the postconviction-relief record on the question of prejudice. It seems to me it is clear that under *Lee*, the requirements of prejudice have not been demonstrated. Although the majority does not cite *Lee* or the analysis offered in *Lee*, it nonetheless comes to the proper conclusion on the prejudice prong. Therefore, I concur in the result in this case.

**C. Attorney Competence in Plea Bargaining: The Erosion of Formalism, the Rise of Functionality, and the Slow Demise of the Direct Versus Collateral Consequences Dichotomy.**

1. *Introduction.* The majority, however, is not content to find that Doss failed to show prejudice. The majority provides an essay on whether the disclosure of information about the rules of the special sentence amount to a collateral consequence. I disagree with the majority's framing of the issue and with many aspects of its analysis. The majority ignores what is at stake in plea bargaining and the critical developments in the law of effective assistance of counsel in the plea bargaining context leading up to the seminal case of *Padilla v. Kentucky*, 559 U.S. 356, 130 S. Ct. 1473. Further, the majority ignores the role of the ABA and other

professional organizations that have developed standards for professional competence that apply in the plea bargaining context. The shallow discussion of effective assistance of counsel in the plea bargaining context does not advance the law and, in fact, is an anchor applying outmoded concepts.

2. *"Utmost solicitude . . . for full understanding . . . of its consequence."* Let's start at the beginning rather than race into squibs from selected cases. In accepting a guilty plea, a criminal defendant is surrendering a panoply of constitutionally protected rights. *McCarthy v. United States*, 394 U.S. 459, 466, 89 S. Ct. 1166, 1171 (1969) (citing waiver of the privilege against self-incrimination, the right to trial by jury, and the right to confront accusers). As a result, in order to comport with due process, a defendant must enter into a plea bargain knowingly and voluntarily. *Id.*

In determining whether a plea bargain has been entered knowingly and voluntarily, a court must employ "the utmost solicitude . . . in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243–44, 89 S. Ct. 1709, 1712 (1969). Note the phrase "full understanding."

We have long held that a defendant "must have *a full understanding* of the consequences of a plea before constitutional rights can be waived knowingly and intelligently." *State v. Boone*, 298 N.W.2d 335, 337 (Iowa 1980) (emphasis added). That, of course, does not mean that the defendant must know everything, but he must have a general knowledge of the consequences of a plea that might affect his decisions to agree to a deal with the prosecution. The entry of a guilty plea is thus a serious matter to ensure that the defendant knows what the defendant is doing.

It is not a check-the-box routine that satisfies the formalistic appetite of an appellate court but leaves an unschooled criminal defendant bewildered by use of legalese and conceptual labels that have no meaning to the average Jill or Joe.

The majority does not recognize the teaching of *Boykin* and *McCarthy*. It simply drives past these cases. But in my view, the need for full understanding, as embraced in *Boykin* and *McCarthy*, is the starting point for any discussion of what a criminal defendant must know before pleading guilty to a crime.

3. *"Utmost solicitude . . . for full understanding . . . of its consequence" requires understanding of the consequences of a lifetime special sentence and SOTP.* In *State v. Hallock*, the court of appeals considered whether a sex offender is required to be informed of the imposition of a lifetime special sentence. 765 N.W.2d 598, 604–06 (Iowa Ct. App. 2009). The court of appeals reasoned that such a disclosure was necessary to support the plea bargain. *Id.* at 605–06.

But the defendant is not simply entitled to be told the magic words that the defendant is subject to a "lifetime special sentence." An untutored criminal defendant would have very little idea what the phrase means. Instead, a criminal defendant who is subject to a lifetime special sentence must be informed of the general nature of the lifetime special sentence in order for his plea agreement to show "the utmost solicitude . . . for full understanding . . . of [the] consequence" of pleading guilty. *See, e.g., State v. Jamgochian*, 832 A.2d 360, 363–64 (N.J. Super. Ct. App. Div. 2003) (noting potential ineffective-assistance claim in counsel failing to advise defendant that community supervision for life would include travel restrictions). To suggest that because the rules are subject to change and are not imposed by a court does not matter to a criminal defendant who is

to have a full understanding of the consequences of a plea. A criminal defendant who pleads guilty to qualifying sexual crimes is automatically subject to the lifetime special sentence and is entitled as a matter of law to at least generally know what it means to be under such supervision.

4. *The irrationality of the distinction between direct and collateral consequences.* The majority generally embraces the distinction between direct and collateral consequences. It cites several Iowa cases embracing that approach. *See State v. Fisher*, 877 N.W.2d 676, 683 (Iowa 2016); *State v. Carney*, 584 N.W.2d 907, 908 (Iowa 1998) (en banc) (per curiam). Under the simplistic and highly formalistic approach, a direct consequence must be disclosed to a criminal defendant pleading guilty while an indirect consequence is as a matter of law irrelevant to the plea bargaining process and need not be disclosed. *See Carney*, 584 N.W.2d at 908.

In my view, it is time to throw the direct versus collateral distinction overboard. First, the dichotomy is unworkable. As noted by one scholar, "[t]he case precedent is a case study in tortured interpretations." Brian M. Murray, *Are Collateral Consequences Deserved?*, 95 Notre Dame L. Rev. 1031, 1032 n.4 (2020). Another refers to the distinction between direct and indirect as "a myriad of unworkable and unclear definitions and rationalizations." Ross Wood, *Black Robes Do Not Require Full Transparency: The Circular and Semantic Distinction Between Direct and Collateral Consequences of a Plea*, 33 Whittier L. Rev. 487, 496 (2012). Scholarship gracing the pages of the Iowa Law Review has characterized the distinction between direct and collateral consequences as "artificial [and] ill-conceived." Jenny Roberts, *Ignorance Is Effectively Bliss: Collateral Consequences, Silence, and Misinformation in the Guilty-Plea Process*, 95 Iowa L. Rev. 119, 124 (2009) [hereinafter Roberts, *Ignorance Is Effectively Bliss*]; *see also* 5 Wayne R. LaFave et al., *Criminal Procedure*

§ 21.4(d), at 979–98 (4th ed. 2015) (citing differences in caselaw regarding manner of determining whether a consequence is direct or collateral); Steve Colella, *"Guilty, Your Honor": The Direct and Collateral Consequences of Guilty Pleas and the Courts That Inconsistently Interpret Them*, 26 Whittier L. Rev. 305, 313–14 (2004) (noting inconsistencies in the application of the dichotomy); Joshua Kaiser, *We Know It When We See It: The Tenuous Line Between "Direct Punishment" and "Collateral Consequences,"* 59 How. L.J. 341, 359–65 (2016) (describing the line between direct and collateral consequences as fictional).

The direct versus collateral dichotomy leads to ridiculous results, including in Iowa, where revocations of drivers' licenses under some statutes are said to be a direct consequence, while others are indirect. *See Fisher*, 877 N.W.2d at 684–85; *Carney*, 584 N.W.2d at 909. The impact on the defendant is identical. And, of course, losing a driver's license is a far greater sanction with far greater consequence for many criminal defendants than, say, a $100 fine. Yet, the imposition of a small fine must be communicated by counsel as it is a "direct consequence" of pleading guilty, while the loss of the driver's license in *Carney* is somehow magically converted into irrelevancy by being classified as indirect. *Carney*, 584 N.W.2d at 909.

Second, there is increased awareness that "[i]mposing collateral consequences has become . . . part and parcel of the criminal case." Gabriel J. Chin & Margaret Love, *Status as Punishment: A Critical Guide to Padilla v. Kentucky*, 25 Crim. Just. 21, 22 (2010); *see also* Wayne A. Logan, *Challenging the Punitiveness of "New-Generation" SORN Laws*, 21 New Crim. L. Rev. 426, 427 (2018) (stating that many onerous mandates of sex offender laws have become common collateral consequences to sex offenses). As noted by another scholar, "[a] focus on collateral sanctions

sets the bar far too low, ignoring the true life impact important to clients. It also squanders many critical opportunities for leveraging better results." McGregor Smyth, *"Collateral" No More: The Practical Imperative for Holistic Defense in a Post-*Padilla *World . . . Or, How to Achieve Consistently Better Results for Clients*, 31 St. Louis U. Pub. L. Rev. 139, 159 (2011).

5. *The developing law of effective assistance.* The Supreme Court has a long history of relying upon the standards developed by the ABA and other reputable legal associations in the development of standards for the effective assistance of counsel. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 1515 (2000); *Roe v. Flores-Ortega*, 528 U.S. 470, 479, 120 S. Ct. 1029, 1035–36 (2000); *Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. The ABA Criminal Justice Standards provide:

> Defense counsel should identify, and advise the client of, collateral consequences that may arise from charge, plea or conviction. Counsel should investigate consequences under applicable federal, state, and local laws, and seek assistance from others with greater knowledge in specialized areas in order to be adequately informed as to the existence and details of relevant collateral consequences. Such advice should be provided sufficiently in advance that it may be fairly considered in a decision to pursue trial, plea, or other dispositions.

*Criminal Justice Standards for the Defense Function* Standard 4-5.4(a) (Am. Bar Ass'n 2015). *See generally* Gabriel J. Chin & Richard W. Holmes, Jr., *Effective Assistance of Counsel and the Consequences of Guilty Pleas*, 87 Cornell L. Rev. 697, 714–17 (2002) (discussing the ABA standards) [hereinafter Chin, *Effective Assistance*].

The ABA standards are not a new or solitary development. The National Legal Aid & Defender Association has declared since 1995 that lawyers must be aware of "other consequences of conviction such as deportation or civil disabilities" when engaging in plea bargaining. *Performance Guidelines for Criminal Defense Representation* Guideline 6.2

(Nat'l Legal Aid & Def. Ass'n 2011). And nearly fifty years ago, Professor Tony Amsterdam in his leading treatise declared that "[n]o intelligent plea decision can be made by either lawyer or client without full understanding of the possible consequences of a conviction." Anthony Amsterdam, *Trial Manual for the Defense of Criminal Cases* § 201 (4th ed. 1984).[13]

In the fashioning of the law of ineffective assistance of counsel under the Sixth Amendment, the Supreme Court routinely looks to these professional norms. If in this case we were to do the same, there would be a firm basis for concluding that effective counsel must reasonably research and communicate the collateral effects of a criminal conviction when engaged in plea bargaining.[14] Notably, unlike the majority opinion, the professional authorities do not contain formalistic direct or indirect approaches, fine analysis of the likelihood of a collateral consequence, or Justinian evaluation of causation. The professional norms stress instead functionality and the need to adequately inform both the lawyer and the client of the consequences of pleading guilty. These professional norms should guide our analysis, not be ignored. And, the norms have been largely adopted by the United States Supreme Court in many settings.

---

[13]Several other scholars have taken similar positions. *See* Chin, *Effective Assistance*, 87 Cornell L. Rev. at 699 (suggesting that effective counsel must communicate collateral consequences); Roberts, *Ignorance Is Effectively Bliss*, 95 Iowa L. Rev. at 167–93 (suggesting the United States Supreme Court should require communication of collateral consequences to empower personal decisions of defendant).

[14]The ABA's Criminal Law Section and the National Institute of Justice developed the National Inventory of Collateral Consequences of Conviction that makes information readily accessible to all Iowa lawyers. *Collateral Consequences Inventory*, Nat'l Inventory of Collateral Consequences of Conviction, https://niccc.nationalreentryresourcecenter.org/ (last visited June 21, 2021). The online database identifies and categorizes the statutes and regulations that impose collateral consequences in all fifty states, the federal system, the District of Columbia, U.S. Virgin Islands, and Puerto Rico. *See generally* Joshua Kaiser, *Revealing the Hidden Sentence: How to Add Transparency, Legitimacy, and Purpose to "Collateral" Punishment Policy*, 10 Harv. L. & Pol'y Rev. 123 (2016) (discussing collateral punishments in each state).

6. *The departure from direct versus collateral formalism in* Padilla v. Kentucky. *In Padilla v. Kentucky*, the Supreme Court considered a case where a criminal defense lawyer incorrectly advised his client that pleading guilty to felony trafficking in marijuana would not affect his immigration status. 559 U.S. at 359–60, 130 S. Ct. at 1478. Although deportation was a civil concept and was not directly imposed by the court, the Court noted that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." *Id.* at 367, 130 S. Ct. at 1482. The Court noted that it had "never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance.' " *Id.* at 365, 130 S. Ct. at 1481 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). The Court declared that "how to apply the direct/collateral distinction has no bearing on the disposition of this case." *Id.* at 364 n.8, 130 S. Ct. at 1481 n.8. What was important to the Court was that that deportation was "intimately related to the criminal process." *Id.* at 365, 130 S. Ct. at 1481. Although deportation might be considered collateral under the collateral versus direct dichotomy, the Court declared that "we find it 'most difficult' to divorce the penalty from the conviction in the deportation context." *Id.* at 366, 130 S. Ct. at 1481. And, the Court recognized the severity of the consequence and its impact on the defendant. *Id.* at 373, 130 S. Ct. at 1486.

So what we have in *Padilla* is a complete recasting of the approach to the role of counsel in the plea bargaining context. Formalistic rules like the direct versus collateral consequence dichotomy were discarded in favor of a functional, fact-intensive exploration of the importance of the consequence to a particular defendant. *Padilla* was thus returning doctrine to a focus on the defendant and whether the plea was knowing

and voluntary and away from considerations of court management and using formalistic and irrational doctrine as a way to close the courthouse door to the proverbial flood of claims.

But one does not have to take my word on the subject. The concurring and dissenting opinion in *Padilla* offered telling insights into the importance of the decision. Justice Alito would have affirmed the collateral consequence rule, noting that the majority's abandonment of it "marks a major upheaval in Sixth Amendment law." *Id.* at 383, 130 S. Ct. at 1491 (Alito, J., concurring in the judgment). Justice Alito, correctly, observed that the majority opinion was inconsistent with past precedent. *Id.* at 382–84, 130 S. Ct. at 1491–92. Although unstated, Justice Alito's point was that the approach to ineffective assistance of counsel in *Padilla* was inconsistent with established precedent like *State v. Carney* that stressed the direct versus collateral dichotomy.

Justice Scalia also would have retained the collateral consequences rule. *Id.* at 390, 130 S. Ct. at 1495 (Scalia, J., dissenting). He also wrote that the logic of the majority position rejecting the collateral versus direct distinction and analyzing the severity and impact of a consequence on a defendant could not be limited to deportation "except by [an act of] judicial caprice." *Id.* at 391, 130 S. Ct. at 1496. The majority opinion, however, by not addressing *Padilla,* does just that.

So, if Justice Alito and Justice Scalia are right, the direct versus collateral consequence dichotomy utilized in this case by the majority opinion in its interpretation of the Sixth Amendment is doubtful at best. They were both convinced that *Padilla* would extend beyond its immigration context into other consequences of conviction. As noted by one scholar who agreed with the Scalia and Alito assessment, the first lesson of *Padilla* is that "the direct-collateral distinction is no longer a

necessary framework for inquiring into whether the Sixth Amendment applies to advice concerning a civil consequence at the plea stage." Colleen F. Shanahan, *Significant Entanglements: A Framework for the Civil Consequences of Criminal Convictions*, 49 Am. Crim. L. Rev. 1387, 1412 (2012); *see also* McGregor Smyth, *From "Collateral" to "Integral": The Seismic Evolution of* Padilla v. Kentucky *and its Impact on Penalties Beyond Deportation*, 54 How. L.J. 795, 800, 812–14 (2011) (describing the duty of attorneys to advise clients on all of the consequences of plea deals).

There is one additional point to be made about *Padilla.* What if the law is not as clear as it was in *Padilla* that the sanction of deportation was automatic or nearly so? What if there was some wiggle room and it is not possible to conclude that the consequence would be automatic? Was that the end of counsel's obligation? The Court said no. Under these circumstances, counsel was required to advise the defendant that there may be immigration consequences of some kind. 559 U.S. at 369, 130 S. Ct. at 1483 (majority opinion). In situations where the inevitability of a consequence is less than clear, such ambiguity would impact "the scope and nature of counsel's advice." *Id.* at 369 n.10, 130 S. Ct. at 1483 n.10. In other words, the advice required would be variable depending upon whether the consequence was certain, likely, or merely possible.

7. *Post-*Padilla *experience.* In the post-*Padilla* era, the caselaw has been mixed. Some cases seek to minimize the scope of *Padilla* by emphasizing its unique features.

Other courts, however, have taken the case at face value. Several courts, for instance have recognized that even where the consequences are not absolutely certain, counsel may have a duty to discuss consequences when discussing plea bargaining. In *Bauder v. Department of Corrections*, the court noted that when the law is unclear, the attorney must advise of

the risk of adverse consequences. 619 F.3d 1272, 1275 (11th Cir. 2010) (per curiam); *see also State v. Ortiz-Mondragon*, 866 N.W.2d 717, 726–27 (Wis. 2015) (same).

A number of other courts have extended the *Padilla* analysis to cases involving sex offender registration. *See, e.g., People v. Dodds,* 7 N.E.3d 83, 97 (Ill. App. Ct. 2014); *People v. Fonville*, 804 N.W.2d 878, 894–95 (Mich. Ct. App. 2011). Similarly, the Supreme Court of Illinois followed *Padilla* in determining that the possibility of civil commitment upon conviction of triggering sexual offenses was sufficiently certain and enmeshed in the criminal process to give rise to a Sixth Amendment duty. *People v. Hughes*, 983 N.E.2d 439, 457–58 (Ill. 2012).

8. *Evolving approach to effective assistance in plea bargaining.* Based on the above discussion, and the dispositive nature of the prejudice prong, I would not use this case to further cement into our law pre-*Padilla* doctrine. I would also decline to embrace formal rules that have the effect of irrationally winnowing claims but do not otherwise advance the values that underlie due process and the right to counsel. As in *Padilla,* I would focus on the defendant and whether, under all the facts and circumstances, his assent to a plea can fairly be characterized as knowing and voluntary.

It is a back-to-basics approach, a restoration of principles of *Boykin* and a rejection of constitutional innovators who developed the direct versus collateral dichotomy. I would require that in order for there to be a duty for counsel to discuss a consequence with the client in the plea bargaining context, the consequence must be enmeshed with the criminal process and must pose a significant enough risk of substantial adverse consequences that it could impact the decision of a particular defendant to enter into a plea. The likelihood that the collateral consequence would

come to pass does not need to be absolute but, as taught in *Padilla*, the advice given must be appropriate to the risks posed by the consequence. My approach is consistent with *Boykin* and *Padilla*, with the professional standards cited above, and with basic concepts of due process.

Specifically, in this case, Doss was entitled to at least know that a special sentence involves an extended period of intense supervision by the state, including regulation of where he lives, his ability to travel, his methods of communication, and his social interactions, and that the consequence of violation of the terms of supervision may include extended periods of incarceration. *See Jamgochian*, 832 A.2d at 363–64 (noting a potential ineffective-assistance-of-counsel claim when an attorney fails to advise client that community supervision for life would include travel restriction); *People v. Monk*, 989 N.E.2d 1, 5–6 (N.Y. 2013) (Rivera, J., dissenting) (stating that a plea bargain where defendant does not know that a violation of the special sentence may lead to incarceration is not knowing and voluntary).

I agree, of course, that the details of the terms of special sentences and SOTP are subject to change. As a result, the majority is correct when it states that it is not possible to predict precisely what each and every rule of a future regulatory regime will look like with great precision. But, the mere fact that we cannot predict with precision the details of a future regime does not induce some kind of lingual paralysis that prevents attorneys from telling their clients what is presently known. Certainly, it is not enough for counsel to simply tell a criminal defendant that he may be subject to a lifetime special sentence or SOTP and then assume the silent smile of the Mona Lisa or the gaze of the Sphinx when the client asks for an explanation.

We should not dictate exactly what kind of disclosure must be made in every case, but it must be enough to ensure that a plea bargain is truly knowing and voluntary for each individual defendant. The parole and SOTP provisions are presented in Exhibits A and B of this opinion. Attorneys may seek to provide their clients with copies to provide a flavor of the kind of supervision they may experience upon their release from prison. Or, attorneys may prefer to give a general overview of lifetime special sentences or the SOTP program to clients that may be subject to them. But one thing is for sure. The focus of our evaluation of ineffective-assistance-of-counsel claims in the plea bargain context must be on the defendant and whether the defendant knows what the defendant is doing when facing a decision regarding whether to accept a plea.

**II. Conclusion.**

I concur in the result in this case based on the failure of Doss to show prejudice. For the reasons expressed above, I cannot join the balance of the majority's opinion.

# EXHIBIT A

E-FILED 2019 MAY 23 3:46 PM WARREN - CLERK OF DISTRICT CO

PLAINTIFF'S
EXHIBIT

1

BEFORE THE BOARD OF PAROLE OF THE STATE OF IOWA

| IN THE MATTER OF PAROLE OF<br>8951533 – Doss, Kenneth Lee | PAROLE ORDER<br>&<br>AGREEMENT |
|---|---|

## PAROLE ORDER

You are hereby notified that the Iowa Board of Parole, pursuant to Chapter 906 of the Iowa Code, considered your prospects for parole and work release on June 30, 2015 and determined that you are able and willing to fulfill the obligations of a law abiding citizen and that there is a reasonable probability that you can be released without detriment to the community or yourself.

The Iowa Board of Parole hereby imposes at a future date the term of special sentence parole required by Iowa Code sections 903B.1/903B.2 (lifetime supervision/10 year supervision) to be imposed upon the date of discharge of the underlying offense for which you are subject to the special sentence parole provisions.You will be processed for the release on or after August 12, 2015 pursuant to the rules and procedures of the Iowa Department of Corrections. You will not be released until the Department of Correctional Services approves your parole plan and until you agree to and sign the terms and conditions of your parole. The Board of Parole may rescind your parole prior to your release if institutional misconduct or adverse information not previously considered is brought to the attention of the Board.

You are subject to the supervision of the supervising District Department of Correctional Services while you are on parole until your discharge date unless earlier discharged. You are required to comply with the terms and conditions of parole established by the Board of Parole, the Department of Corrections, the District Department of Correctional Services and the laws, rules and regulations of the United States, the State of Iowa, and each individual State, municipality and local governmental entity as appropriate. Failure to comply with any State, Federal or local law, regulation or ordinance, and/or any of the conditions of parole may result in the revocation of your parole.

## PAROLE AGREEMENT TERMS AND CONDITIONS

The following are the standard terms and conditions that you agree to comply with while you are on parole and you agree to comply with any additional conditions that may be added during the course of your supervision by your supervising Judicial District Director or Director's designee or the Board of Parole:

### 10: Restrictions on Movement

I shall report immediately to the supervising Judicial District Director or Director's designee, designated to my parole instructions. I will reside at the place designated in my parole instructions and shall not change residence unless I receive prior approval from the supervising Judicial District Director or Director's designee. I will obey any curfew restrictions placed upon me by supervising Judicial District Director or Director's designee. I shall not leave the county of my residence unless I receive permission to travel from my supervising Judicial District Director or Director's designee.

    10b. I will reside at the Residential Correctional Facility until discharged by the Residential Manager and/or my supervising Judicial District Director or Director's designee. I shall obey all of the rules and regulations of the Residential Correctional Facility.

### 20: Supervision Conduct

I shall maintain contact with my supervising officer as directed and shall not lie to, mislead, or misinform my supervising officer either by statement or omission of information. I shall follow all conditions that can and may be placed on my parole by the Board of Parole and any additional conditions that can be added by my supervising Judicial District Director or Director's designee at any time during my supervision.

    20a. I shall participate in intensive parole supervision program unless my supervising Judicial District Director or Director's designee determines otherwise.

    20c. I understand that I will be on parole supervision until the actual date of the discharge of the

sentence(s) for which I am on supervision and that I will not be discharged early from supervision unless this condition is, otherwise, amended by the Board of Parole.

22. I shall not use the internet or other forms of electronic social media for anything other than job searches, unless approved by my supervising Judicial District Director or Director's Designee.

### 30: Restrictions on Association

I shall not associate with any person having a criminal record, currently under supervision or any person known or suspected to be engaged in criminal activity, unless approved by my supervising Judicial District Director or Director's designee. I shall treat all persons with respect and courtesy and refrain from assaultive, intimidating, or threatening verbal or physical abuse. I shall have no direct or indirect contact or communication with any victim or the family of any victim of my offense(s), unless contact or communication with any victim or the family of any victim is authorized by my supervising Judicial District Director or Director's designee."

30b. I shall have no direct or indirect contact or communication with any victim or the family of any victim of my offense(s)."

30c. I shall have no contact with any minor child - direct or indirect. I shall not work, reside, establish contact with or join any group or organization that deals with minors.

### 40: Treatment, Rehabilitation & Other Programming

I shall participate and cooperate with any treatment, rehabilitation, or monitoring programs; including any electronic monitoring required by the District I am being supervised in. I shall seek mental health services as appropriate. I shall submit a DNA sample if requested by my supervising officer or other law enforcement official. If needed, I shall continue to work toward attaining my GED or complete the requirements for a high school diploma. I shall schedule and keep all appointments necessary for the successful completion of programs and services in which I am participating and for the successful completion of my parole supervision. I shall sign any release or waiver requested by my parole officer to authorize my parole officer to receive and access any information relating to any treatment program or otherwise, as requested by my parole officer.

40a. I shall complete sex offender treatment and sex offender aftercare treatment program unless my supervising Judicial District Director or Director's designee determines otherwise.

### 50: Substance Abuse

I shall not use, purchase, or possess alcoholic beverages and shall submit to alcohol tests and drug tests when directed by my supervising Judicial District Director or Director's designee. I shall not enter taverns or liquor stores or other establishments where the primary activity is the sale of alcoholic beverages. I will not use, ingest, inject, huff, possess or smoke any illegal or synthetic substances. I shall not use, purchase, possess or transfer any drugs unless prescribed to me by a physician.

### 60: Legal Conduct

I shall obey all laws and ordinances. I shall notify a parole officer within 24 hours if I am arrested, receive a citation or if I have any contact with law enforcement. I shall not own, possess, use or transport firearms, dangerous weapons, or imitations thereof, unless approved by my supervising officer. I will submit my person, property, place of residence, vehicle, and personal effects to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by my parole officer or law enforcement officer. I waive extradition to the State of Iowa from any jurisdiction in or outside the United States (including Indian Reservation or Indian Trust Land) and also agree that I will not contest any effort by any jurisdiction to return me to the State of Iowa.

### 70: Economic

I shall pay restitution, court costs, and attorney fees as directed by the court. I shall pay any fees associated with programs and services ordered by my supervising Judicial District Director or Director's designee during the course of my supervision. I will comply with all the terms of my restitution plan. I will pay to the supervising District Department of Correctional Services an enrollment fee to offset the cost of my supervision as provided in the Iowa Code. I will pay this fee upon such terms as my supervising officer directs. I understand that I may not be discharged from parole until all fees are paid. I shall secure and maintain employment as directed by my supervising officer. I shall notify my supervising officer within twenty-four (24) hours if my employment is terminated. I shall seek employment if I am unemployed and shall report my efforts to find employment as directed by my supervising officer.

Board of Parole                                    Page 2 of 3                                    08/12/2015

**ge: Driving**

I shall not operate a motor vehicle upon the public roads and highways unless I have a current, valid driver's license and insurance. If my driving privileges were suspended, revoked or barred, and now have been reinstated by the Department of Transportation, I must receive approval from my supervising Judicial District Director or Director's designee prior to getting my driver's license.

I hereby certify that I have read or have had read to me the above Parole Order and Agreement as I have indicated with my initials on each condition. I understand and agree that the Parole Order and Agreement is in effect until I am discharged from parole. I understand that entering into informant activity with any law enforcement agency will not excuse violations of the terms and conditions of parole. I am aware that I may file grievances concerning actions taken in the supervision of my parole.

Signed and witnessed this _14_ day of _Aug._, _2015_.

_____
Parolee's Signature

_____
Warden's or Designee's

_____
Parole Officer's Signature

_____
John F. Hodges, J.D., Chair
Iowa Board of Parole

* The victim's family includes spouse, child, mother, father, siblings, step-parents, step-children, step-siblings, and/or any legal guardian, aunts and uncles as well as their children (1st cousins to victim) and grandparents.

_____
Parole Officer

_____
Officer

_9/15/16_
Date

53

## EXHIBIT B

E-FILED 2019 MAY 23 3:46 PM WARREN - CLERK OF DISTRICT C



PLAINTIFF'S
EXHIBIT
2

Sex Offender Treatment Program
Rules & Conditions Contract

Please read this contract carefully. Initial after each rule on the line provided to indicate a full understanding of the condition as listed.

1.) I agree to abide by all conditions as stated in this contract throughout the duration of my supervision unless I obtain documented approval for any changes, additions or amendments by my PO, Board of Parole (when required) and SOTP team.

2.) I will attend SOTP group sessions as scheduled.

3.) I will abide by all rules of confidentiality. A breach of confidentiality is serious and may be considered grounds for dismissal from SOTP. I understand that any information shared in group may be discussed by my group facilitators, SOTP staff, DOC DCS staff, law enforcement, Board of Parole, as well as the Court, and my respective county attorney's office as necessary.

4.) I will complete all assignments and actively participate in group. It is my responsibility to inform SOTP staff if I have difficulty reading or writing.

5.) I will complete all assessments and evaluations as required.

6.) I will complete all polygraph examinations as required.

7.) I will not participate in any form of outside counseling. I understand that I may be required to participate in individual treatment when recommended by my PO and SOTP staff.

8.) I will not attend church or religious gatherings, in any form or location.

9.) I will not establish, pursue or maintain any dating, romantic and/or sexual relationship(s).

10.) I will not purchase, possess or view sexually explicit materials. I will not enter any establishment in which the primary intent of the business is for sexual entertainment or of a pornographic nature as determined by my PO/SOTP staff.

11.) I will not view, access or use the Internet through any means.

12.) I will not view or possess images/photos/videos of my victim(s) or minors.

13.) I will not have direct or indirect contact with the victim(s) of current or previous offense(s)

14.) I will not have direct or indirect contact with any minors.

25

KD003372

15.) I will not enter any establishment in which the primary intent of the business is providing services exclusively or primarily for minors.

16.) I will submit an Employment Verification Form to my PO prior to reporting for work. I will inform my employer of my status on parole/probation and the Iowa Sex Offender Registry.

17.) I will not engage in sexually offensive behavior in public or otherwise.

18.) I understand I am responsible for all SOTP costs and supervision fees incurred.

STATEMENT OF UNDERSTANDING

I confirm that I understand all rules and conditions outlined in this document. I agree to abide by all conditions as stated throughout the duration of my supervision unless I obtain documented approval for any changes, additions or amendments by my PO. Board of Parole (when required) and SOTP team.

Name (Printed): _Ken K. Doss_

Signature: _Ken L. Doss_

Date: _10-31-16_

*Fifth Judicial District Department of Correctional Services*:

SOTP Staff Signature: _____

Date: _10/31/16_

26

KD003373

**McDONALD, Justice (concurring specially).**

I concur in the majority's resolution of Doss's claims arising under the Federal Constitution, but I concur in only the judgment with respect to the resolution of Doss's claims arising under the Iowa Constitution. With respect to those claims, Doss did not adequately brief them. The majority nonetheless resolves Doss's state constitutional claims by adopting federal constitutional law as Iowa constitutional law. For the reasons set forth in my separate opinion in *State v. Gibbs*, I believe the majority's approach is procedurally and substantively flawed. 941 N.W.2d 888, 902–05 (Iowa 2020) (McDonald, J., concurring specially in the judgment). I would hold Doss forfeited his state constitutional claims by failing to brief the claims with citations to relevant Iowa authority. *See id.* at 905; *see also* Iowa R. App. P. 6.903(2)(*g*)(3); *State v. LaMar*, 260 Iowa 957, 970, 151 N.W.2d 496, 503 (1967) ("We have adequate procedure, if followed, to properly determine the constitutional question involved and there is a legitimate interest and a sound public purpose to be served by a procedural rule which requires that . . . this court be apprised of the question of law involved in the manner prescribed by the statute and our decisions.").

Procedurally, the issue is fairly clear. The rules of appellate procedure require that each issue raised must be supported by an argument with citation to authorities. *See* Iowa R. App. P. 6.903(2)(*g*)(3). The failure to cite relevant authorities "in support of an issue may be deemed waiver of that issue." *Id.* This is settled law in Iowa. *See State v. Short*, 851 N.W.2d 474, 479 (Iowa 2014) (collecting cases). Doss failed to comply with this requirement.

Substantively, the majority's approach is flawed. To highlight the substantive issue, consider the following hypothetical. A plaintiff brings a tort claim arising under Iowa law in an Iowa court and receives an adverse judgment in the district court. On appeal, the plaintiff does not brief or discuss Iowa tort law but instead briefs and discusses the tort law of a separate sovereign, say Minnesota. The plaintiff does not ask this court to consider and adopt Minnesota tort law on the relevant question. Instead, the plaintiff briefs and discusses Minnesota tort law and then asks this court to reject Minnesota tort law and do something different than the Minnesota Supreme Court has done or would do if faced with the relevant question. It seems apparent we would never resolve a claim in this manner. Except we do in cases involving claims arising under the Iowa Constitution. Only in cases involving claims arising under the Iowa Constitution does this court not require parties to raise issues, brief them, and cite relevant authority. Only in cases involving claims arising under the Iowa Constitution does this court adopt the law of a separate sovereign—the federal government—whether or not it is the same as Iowa law for the purposes of resolving claims under Iowa law. That's bonkers.

To the best of my knowledge, no other state has adopted such an approach. Instead, other states hold a defendant waives or forfeits underdeveloped state constitutional claims. *See, e.g., State v. Zerkel*, 900 P.2d 744, 758 n.8 (Alaska Ct. App. 1995) ("When a defendant asserts that the Alaska Constitution affords greater protection than the corresponding provision of the Federal Constitution, it is the defendant's burden to demonstrate something in the text, context, or history of the Alaska Constitution that justifies this divergent interpretation. Given the defendants' inadequate briefing, this argument is waived." (citations omitted)); *State v. Dean*, 76 P.3d 429, 432 n.1 (Ariz. 2003) (en banc) ("While

Dean argues that the search in this case violates both the Fourth Amendment and Article 2, Section 8 of the Arizona Constitution, he presents no separate arguments based on the state constitutional provision.  We therefore address his claim only under the United States Constitution."); *State v. Ells*, 667 A.2d 556, 559 (Conn. App. Ct. 1995) (declining to review state constitutional claim due to inadequate briefing); *State v. Howard*, 473 P.3d 857, 859 n.2 (Idaho Ct. App. 2020) ("Howard points to the Idaho Constitution and makes the broad assertion that it provides additional protections beyond the Fourth Amendment.  However, other than his broad assertion, Howard does not make a legal argument as to how the Idaho Constitution provides more protections or explain factually why Howard is entitled to these heightened protections. Consequently, we will not consider his state constitution argument on appeal."); *Abel v. State*, 773 N.E.2d 276, 278 n.1 (Ind. 2002) ("Because Abel presents no authority or independent analysis supporting a separate standard under the state constitution, any state constitutional claim is waived."); *Hagez v. State*, 749 A.2d 206, 217 (Md. Ct. Spec. App. 2000) ("Nevertheless, because appellant has not presented a separate analysis of his double jeopardy claim under either Article 5 or common law, we confine our analysis to the application of the Fifth Amendment's Double Jeopardy Clause."); *State v. White*, 199 P.3d 274, 280 (Mont. 2008) (declining to resolve "undeveloped" state constitutional claim), *overruled on other grounds by State v. Tirey*, 247 P.3d 701 (Mont. 2010); *State v. Oakes*, 13 A.3d 293, 300 (N.H. 2010) ("Because the defendant has not developed his constitutional arguments, we decline to address them." (quoting *State v. Lott*, 879 A.2d 1167, 1173 (N.H. 2005))); *Arganbright v. State*, 328 P.3d 1212, 1221 (Okla. Crim. App. 2014) (declining to address state constitutional claim where not developed); *Commonwealth v. Bond*, 693

A.2d 220, 225 (Pa. Super. Ct. 1997) ("[A]lthough appellant argues that his rights under both the United States and Pennsylvania Constitutions have been violated, he has [not] . . . explained how the Pennsylvania Constitution differs from the protection afforded by the United States Constitution. Instead, appellant merely 'clumps' his constitutional arguments together and expects this Court to create a state constitutional argument on his behalf. This we decline to do."); *Martins v. State*, 52 S.W.3d 459, 469 (Tex. App. 2001) ("We first observe that appellant has not briefed his claim regarding his state constitutional rights separately from his claim regarding his federal constitutional rights, nor has he provided any rationale for construing the Texas Constitution more broadly than the U.S. Constitution. He has thus forfeited error on his state ground and we do not address his third issue."); *State v. Sieyes*, 225 P.3d 995, 1004 (Wash. 2010) (en banc) (declining to address state constitutional claim where inadequately briefed).

The briefing requirement in our rules of appellate procedure is "not intended to be legal bramble bush that serve[s] no purpose other than ensnaring unwitting litigants." *State v. Tidwell*, No. 13–0180, 2013 WL 6405367, at *2 (Iowa Ct. App. Dec. 5, 2013). Instead, it is intended to ensure our appellate courts have the full benefit of the parties' analysis and thoughts on the legal issues presented. This is particularly important with respect to claims arising under the Iowa Constitution. The Iowa Constitution is the supreme law of this state, but it became a litigation afterthought following federal incorporation of the Bill of Rights into the Fourteenth Amendment. In recent years, however, this court, like many other courts, has expressed an interest in returning to first principles and developing state constitutional law independent of federal constitutional law. Admittedly, there have been and will continue to be doctrinal

stumbles along the way as we continue to retrain our atrophied state-constitutional-law muscles, but that is exactly why litigants must brief these critically important issues. As the Utah Supreme Court explained:

> As with most legal arguments, there is no magic formula for an adequate state constitutional analysis. Arguments based, for example, on historical context, the constitution's text, public policy, or persuasive authority would all meet our briefing requirements. But cursory references to the state constitution within arguments otherwise dedicated to a federal constitutional claim are inadequate. When parties fail to direct their argument to the state constitutional issue, our ability to formulate an independent body of state constitutional law is compromised. Inadequate briefing denies our fledgling state constitutional analysis the full benefit of the interested parties' thoughts on these important issues.

*State v. Worwood*, 164 P.3d 397, 405 (Utah 2007).

For these reasons, I would hold Doss forfeited his claims arising under the Iowa Constitution.

Oxley, J., joins this special concurrence.